ORAL ARGUMENT NOT SCHEDULED

**No. 25-5383**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

NEW CIVIL LIBERTIES ALLIANCE,

PLAINTIFF-APPELLANT,

v.

U.S. SECURITIES AND EXCHANGE COMMISSION,

DEFENDANT-APPELLEE.

---

On Appeal from the United States District Court
for the District of Columbia, 1:22-cv-03567-CJN

---

# BRIEF OF THE U.S. SECURITIES AND EXCHANGE COMMISSION, APPELLEE

---


J. RUSSELL MCGRANAHAN
General Counsel

ELIZABETH MCFADDEN
Deputy General Counsel

MELINDA HARDY
Assistant General Counsel

ALEXANDRA VERDI
Attorney
U.S. Securities and Exchange Commission
Boston Regional Office
33 Arch Street, Floor 24
Boston, Massachusetts 02110
(202) 551-5057 (Verdi)
verdim@sec.gov

*Counsel for Defendant-Appellee*
*U.S. Securities and Exchange Commission*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A. Parties and Amici.**

New Civil Liberties Alliance ("NCLA") was the plaintiff in the district court and is the appellant in this Court.

The U.S. Securities and Exchange Commission ("SEC") was the defendant in the district court and is the appellee in this Court.

**B. Rulings Under Review.**

The ruling under review is United States District Judge Carl J. Nichols's August 29, 2025 Memorandum Opinion and Order granting the SEC's motion for summary judgment. *See* J.A. 193-203; *New C.L. All. v. Sec. Exch. Comm'n*, No. 1: 22-CV-03567 (CJN), 2025 WL 2494683 (D.D.C. Aug. 29, 2025).

**C. Related Cases.**

This case has not previously been before this Court.

Counsel for the SEC is aware of the related cases *Jarkesy v. SEC* (S.D. Tex. No. 3:22-cv-405) and *NCLA et al. v. SEC* (S.D. Tex. 3:23-cv-00402). This case relates to those cases because all three cases concern Freedom of Information Act ("FOIA") requests submitted to the SEC for records regarding a control deficiency related to the separation of enforcement and adjudicatory functions within the SEC's system for administrative adjudications. The FOIA requests at issue in the three cases seek many of the same documents.

In both this case and in *Jarkesy v. SEC*, the district courts have agreed with the SEC's withholdings of information pursuant to FOIA Exemptions 5 and 6 from records that the SEC released to both NCLA and Mr. Jarkesy. *Jarkesy v. SEC*, No. 3:22-CV-405, 2024 WL 4101811, at *2, *5-10 (S.D. Tex. July 3, 2024). In *NCLA et al. v. SEC*, which is ongoing, the SEC released to the parties, which include NCLA and Mr. Jarkesy, one of the groups of records at issue in this case.

**TABLE OF CONTENTS**

Table of Authorities ..................................................................................vi

Glossary..........................................................................................xv

Statement Regarding Oral Argument ....................................................xvi

Introduction.........................................................................................1

Counterstatement of Jurisdiction ...........................................................1

Counterstatement of the Issues ..............................................................2

Counterstatement of the Case .................................................................2

A. Counterstatement of the Facts...................................................2

B. Proceedings Below..................................................................8

1. NCLA sued the SEC. ........................................................8

2. The district court granted the SEC's motion for summary judgment. ..........................................................................9

C. *Jarkesy v. SEC*......................................................................10

Standard of Review..............................................................................11

Summary of Argument ........................................................................11

Argument............................................................................................13

I. The district court correctly found that the SEC appropriately withheld information from the First Category of records under FOIA Exemptions 5 and 6. ............13

A. The SEC can withhold exempt information when responding to FOIA requests. ........................................13

B. The SEC's *Vaughn* Index and declarations are sufficient. ....................................................................14

1. The SEC's *Vaughn* Index and declarations describe all the documents the SEC withheld in response to the First Category. ............................14

2. The descriptions in the SEC's *Vaughn* Index and declarations provide the necessary information to address the SEC's withholding decisions. ...........17

C. The SEC properly withheld information under Exemption 5. ..................................................................18

1. The SEC properly determined that communications with BRG and General Dynamics were intra-agency communications......................19

2. The SEC properly withheld information under the attorney work-product doctrine. ...........................24

3. The SEC properly withheld information under the deliberative process privilege. ..............................29

D. The SEC properly withheld information under Exemption 6. ..................................................................35

E. The SEC conducted a segregability analysis and reasonably foresaw that disclosure of withheld information would harm interests protected by Exemptions 5 and 6. ......................................................43

II. The district court correctly found that the SEC conducted an adequate search for records responsive to the Second Category. ..........................................................49

Conclusion ..........................................................................................54

Certificate of Compliance with Rule 32(a) ..........................................................56

Certificate of Service ..........................................................................................57

## TABLE OF AUTHORITIES

## CASES

*Am. C.L. Union v. U.S. Dep't of Def.*,

628 F.3d 612 (D.C. Cir. 2011) .......................................................................13

*Amiri v. Nat'l Sci. Found.*,

664 F. Supp. 3d 1 (D.D.C. 2021) ................................................................ 17, 52

*Brown v. FBI*,

873 F. Supp. 2d 388 (D.D.C. 2012) ..................................................................41

*Ctr. for Pub. Integrity v. U.S. Dep't of Def.*,

486 F. Supp. 3d 317 (D.D.C. 2020) ..................................................................35

*Charles v. Off. of the Armed Forces Med. Exam'r*,

935 F. Supp. 2d 86 (D.D.C. 2013) ....................................................................42

*Chavis v. U.S. Dep't of Just.*,

No. 1:20-CV-00638 (TNM), 2021 WL 1668069 (D.D.C. Apr. 28, 2021)... 13, 16

*Clemente v. FBI*,

No. 1:20-CV-1527 (TNM), 2022 WL 17092585 (D.D.C. Nov. 21, 2022) .. 45, 46

*Cotton v. Adams*,

798 F. Supp. 22 (D.D.C. 1992) .................................................................. 38, 40

*Davidson v. United States*,

264 F. Supp. 3d 97 (D.D.C. 2017) ............................................................ 38, 39

*Dep't of Interior v. Klamath Water Users Protective Ass'n*,

532 U.S. 1 (2001) ............................................................................... 19, 21

*EEOC v. Lutheran Soc. Servs.*,

186 F.3d 959 (D.C. Cir. 1999) ..........................................................................28

*Elec. Frontier Found. v. U.S. DOJ*,

739 F.3d 1 (D.C. Cir. 2014) ..............................................................................30

*Elec. Priv. Info. Ctr. v. DHS*,

892 F. Supp. 2d 28 (D.D.C. 2012) ............................................................ 22, 30

*Elec. Priv. Info. Ctr. v. FBI*,

No. 1:17-cv-00121 (TNM), 2018 WL 2324084 (D.D.C. May 22, 2018) .... 44, 52

*Elec. Priv. Info. Ctr. v. U.S. DOJ*,

320 F. Supp. 3d 110 (D.D.C. 2018) ..................................................................31

*Energy Pol'y Advocs. v. U.S. Dep't of State*,

No. 1:19-CV-03307 (TNM), 2023 WL 4198200 (D.D.C. June 27, 2023)... 45, 48

*Energy Pol'y Advocs. v. SEC*,

No. CV 23-507 (RC), 2024 WL 4512386 (D.D.C. Oct. 17, 2024) .....................18

*Georgia v. U.S. Dep' of Just.*,

148 F.4th 724 (D.C. Cir. 2025)............................................................ 19, 20, 28

*Gov't Accountability Project v. U.S. Dep't of State*,

699 F. Supp. 2d 97 (D.D.C. 2010) ......................................................................36

*Hall & Assocs. v. U.S. EPA*,

633 F. Supp. 3d 55 (D.D.C. 2022) ......................................................................18

*Hall & Assocs. v. U.S. EPA*,

No. 16-5315, 2018 WL 1896493 (D.C. Cir. Apr. 9, 2018) .................................53

*Hall & Assocs. v. U.S. EPA*,

No. 19-1095 (RC), 2020 WL 4673411 (D.D.C. Aug. 12, 2020).........................40

*Hall v. Larsen*,

46 F. App'x 634 (D.C. Cir. 2002).......................................................................14

*Hertzberg v. Veneman*,

273 F. Supp. 2d 67 (D.D.C. 2003) ......................................................................24

*Horvath v. U.S. Secret Serv.*,

419 F. Supp. 3d 40 (D.D.C. 2019) ......................................................................38

*Hum. Rts. Def. Ctr. v. U.S. Park Police*,

126 F.4th 708 (D.C. Cir. 2025)...........................................................................39

*Jarkesy v. SEC*,

No. 3:22-CV-405, 2024 WL 4101811 (S.D. Tex. July 3, 2024) ............. ii, 10, 11

*Jarvis v. Comm'r, Soc. Sec. Admin.*,

No. 18-5170, 2018 WL 6722401 (D.C. Cir. Dec. 18, 2018) ..............................53

*Jud. Watch, Inc. v. U.S. DOJ*,

432 F.3d 366 (D.C. Cir. 2005) ........................................................ 27, 28, 34, 44

*Jud. Watch, Inc. v. U.S. DOJ*,

806 F. App'x 5 (D.C. Cir. 2020) ........................................................................25

*Jud. Watch, Inc. v. U.S. Dep't of Homeland Sec.*,

736 F. Supp. 2d 202 (D.D.C. 2010) ..................................................................46

*Keeping Gov't Beholden, Inc. v. U.S. Dep't of Justice*,

No. CV 17-1569, 2021 WL 5918627 (D.D.C. Dec. 13, 2021)...........................45

*Kleinert v. BLM*,

132 F. Supp. 3d 79 (D.D.C. 2015) ....................................................................41

*Lardner v. U.S. Dep't of Just.*,

398 F. App'x 609 (D.C. Cir. 2010)....................................................................43

*Lardner v. U.S. Dep't of Just.*,

No. 1:03-CV-0180(JDB), 2005 WL 758267 (D.D.C. Mar. 31, 2005) ................43

*Lawyers' Comm. for C.R. v. U.S. Off. of Mgmt. & Budget*,

No. CV 18-645 (EGS), 2023 WL 3433978 (D.D.C. May 12, 2023)............ 47, 48

*Leadership Conf. on C.R. v. Gonzales*,

404 F. Supp. 2d 246 (D.D.C. 2005)..................................................................41

*Leopold v. U.S. DOJ*,

487 F. Supp. 3d 1 (D.D.C. 2020)......................................................................25

*Lewis v. U.S. Dep't of Treasury*,

No. 17-CV-0943 (DLF), 2020 WL 1667656 (D.D.C. Apr. 3, 2020)..................33

*Machado Amadis v. U.S. DOJ*,

388 F. Supp. 3d 1 (D.D.C. 2019)......................................................................52

*Machado Amadis v. U.S. Dep't of State*,

971 F.3d 364 (D.C. Cir. 2020).................................................................... 34, 47

*McKinley v. Bd. of Governors of the Fed. Reserve Sys.*,

647 F.3d 331 (D.C. Cir. 2011).................................................................... 19, 24

*Nat'l Inst. of Mil. Just. v. U.S. DOD*,

404 F. Supp. 2d 325 (D.D.C. 2005)..................................................................20

*Nat'l Inst. of Mil. Just. v. U.S. DOD,*

512 F.3d 677 (D.C. Cir. 2008)..........................................................................20

*Nat'l Sec. Archive v. CIA*,

104 F.4th 267 (D.C. Cir. 2024) ........................................................................ 11

*Nova Oculus Partners, LLC v. U.S. SEC*,

486 F. Supp. 3d 280 (D.D.C. 2020) .................................................................. 38

*People for the Am. Way Found. v. Nat'l Park Serv.*,

503 F. Supp. 2d 284 (D.D.C. 2007) .................................................................. 43

*Power the Future v. U.S. Dep't of State*,

No. 24-346 (RC), 2025 WL 343175 (D.D.C. Jan. 30, 2025) ....................... 39, 40

*Prechtel v. FCC*,

330 F. Supp. 3d 320 (D.D.C. 2018) .................................................................. 41

*Reliant Energy Power Generation, Inc. v. FERC*,

520 F. Supp. 2d 194 (D.D.C. 2007) .......................................... 31, 32, 36, 39, 47

*Reporters Comm. for Freedom of the Press v. FBI*,

3 F.4th 350 (D.C. Cir. 2021) ............................................................................ 49

*Shapiro v. U.S. Dep't of Just.*,

969 F. Supp. 2d 18 (D.D.C. 2013) .................................................................... 28

*Skinner v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,

No. 12-5319, 2013 WL 3367431 (D.C. Cir. May 31, 2013) .............................. 53

*Stern v. F.B.I.*,

737 F.2d 84 (D.C. Cir. 1984) .......................................................................42

*Techserve Alliance v. Napolitano*,

803 F. Supp. 2d 16 (D.D.C. 2011) ..............................................................32

*Telematch, Inc. v. U.S. Dep't Agric.*,

45 F.4th 343 (D.C. Cir. 2022) ............................................................... 36, 37

*United for FBI Integrity v. U.S. Dep't of Just.*,

No. CV 22-2885 (RC), 2024 WL 961001 (D.D.C. Mar. 6, 2024) ......................42

*United States Fish & Wildlife Serv. v. Sierra Club, Inc.*,

592 U.S. 261 (2021) ..................................................................... 13, 19, 29

*Waterman v. IRS*,

288 F. Supp. 3d 206 (D.D.C. 2018) ............................................................41

## STATUTES

5 U.S.C. § 552(a)(8)(A) ..............................................................................44

5 U.S.C. § 552(b)(5)....................................................................................18

5 U.S.C. § 552(b)(6)....................................................................................36

## RULES

Fed. R. App. P. 34(a)(2)(C) ........................................................................ xvi

Fed. R. Civ. P. 26(b)(3)...............................................................................24

## SEC STATEMENTS

U.S. Secs. & Exch. Comm'n, *Commission Statement Relating to Certain Administrative Adjudications* (Apr. 5, 2022), https://www.sec.gov/newsroom/speeches-statements/commission-statement-relating-certain-administrative-adjudications ........ 2, 3, 23, 34, 53

U.S. Secs. & Exch. Comm'n, *Second Commission Statement Relating to Certain Administrative Adjudications* (June 2, 2023), https://www.sec.gov/newsroom/speeches-statements/second-commission-statement-relating-certain-administrative-adjudications ........ 7, 23, 25, 26, 30, 34, 53

## SEC FILINGS & REPORTS

Letter from the Solic. Gen., *SEC v. Cochran*, No. 21-1239 (S. Ct. Apr. 8, 2022), https://www.supremecourt.gov/DocketPDF/21/21-1239/220641/20220408165202974_Letter%2021-1239%20final.pdf ........ 26

Notice of Supplemental Auth., *Jarkesy v. SEC*, No. 20-61007, Dkt. No. 117 (5th Cir. Apr. 5, 2022) ........ 26

U.S. SECS. & EXCH. COMM'N OFF. OF INSPECTOR GEN., SEMIANNUAL REPORT TO CONGRESS 04.01.23 to 09.30.23, https://www.sec.gov/files/semiannual-report-congress-april-1-2023-through-september-30-2023.pdf ........ 23, 42

## SECONDARY SOURCES

*SEC Enforcement Staff Accessed Adjudicatory Documents in Midst of Administrative Proceedings*, NCLA (Apr. 6, 2022), https://nclalegal.org/press_release/sec-enforcement-staff-accessed-adjudicatory-documents-in-midst-of-administrative-proceedings/..........................................26

## GLOSSARY

| | |
|---|---|
| BRG | Berkeley Research Group, LLC |
| FOIA | Freedom of Information Act |
| J.A. | Joint Appendix |
| NCLA | New Civil Liberties Alliance |
| OIG | Office of Inspector General |
| OIP | Order Instituting Proceedings |
| OIT | Office of Information Technology |
| SEC | U.S. Securities and Exchange Commission |

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is unnecessary in this appeal because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument. Fed. R. App. P. 34(a)(2)(C).

## INTRODUCTION

Plaintiff-Appellant New Civil Liberties Alliance ("NCLA") appeals the district court's entry of summary judgment in favor of the U.S. Securities and Exchange Commission ("SEC") in this Freedom of Information Act ("FOIA") action. NCLA submitted a FOIA request to the SEC seeking records concerning a control deficiency related to the separation of enforcement and adjudicatory functions within the SEC's system for administrative adjudications. The parties agreed to narrow NCLA's FOIA request, and the SEC issued responses to that narrowed request. NCLA nonetheless challenges, with respect to certain records, whether the SEC properly withheld information protected by the FOIA exemptions and, with respect to other records, whether the SEC conducted a reasonable search for responsive records. Because the SEC's withholdings are appropriate, and its search was adequate, summary judgment was warranted.

## COUNTERSTATEMENT OF JURISDICTION

The district court had jurisdiction over this FOIA action under 5 U.S.C. § 552(a)(4)(B). On August 29, 2025, the district court entered an order granting the SEC's motion for summary judgment and terminating the case. J.A. 193. On October 28, 2025, NCLA timely filed a notice of appeal of that judgment under Federal Rule of Appellate Procedure 4. J.A. 5. This Court has jurisdiction under 28 U.S.C. § 1291 to hear this appeal of a final judgment.

## Counterstatement of the Issues

(1) Whether the district court correctly concluded that the SEC appropriately withheld information from records it released in response to NCLA's FOIA request pursuant to FOIA Exemptions 5 and 6.

(2) Whether the district court correctly found that the SEC properly responded to a FOIA request where it directed NCLA to publicly accessible records and determined that the request was improper to the extent it sought identification of any additional documents.

## Counterstatement of the Case

### A. Counterstatement of the Facts

On April 5, 2022, the SEC issued a statement explaining that it had "identified a control deficiency related to the separation of its enforcement and adjudicatory functions within its system for administrative adjudications." U.S. Secs. & Exch. Comm'n, *Commission Statement Relating to Certain Administrative Adjudications*, (Apr. 5, 2022), https://www.sec.gov/newsroom/speeches-statements/commission-statement-relating-certain-administrative-adjudications ("April 5, 2022 Statement"). The SEC said that it had "commence[d] a comprehensive internal review to assess the scope and potential impact of the issue" and that it was "releasing the findings of that review as it relates to two adjudicatory matters currently in litigation in federal court." *Id.* The statement

describes the internal review and states that it is "being conducted by experienced investigative staff from the Division of Examinations under the supervision of the Commission's General Counsel." *Id.* The statement also states that, to support the internal review, the Office of the General Counsel ("OGC") retained the consulting firm Berkeley Research Group, LLC ("BRG"), and the internal team and BRG consultants are performing a comprehensive review of the facts surrounding the control deficiency and assessing its potential impact on administrative adjudicatory matters. *Id.* It explains that BRG is also conducting an independent forensic analysis to determine the scope and potential impact of the control deficiency as well as an analysis of access logs for the various systems. *Id.* The majority of the statement discusses the impact of the control deficiency on two administrative proceedings that had related matters pending in federal court at the time of the statement, *SEC v. Cochran*, No. 21-1239 (S. Ct.), and *Jarkesy v. SEC*, No. 20-61007 (5th Cir.). *Id.* The statement concludes by stating that "[t]he review team will continue to assess the remaining affected adjudicatory matters, and we will release those findings as soon as we are able to do so." *Id.*[1]

[1] The SEC separately retained General Dynamics to support the SEC's Office of Information Technology ("OIT"). J.A. 44 at ¶12. During the internal review, General Dynamics contractors helped OIT staff provide information to BRG and the review team so that BRG could conduct its forensic analysis. *Id.*

In July 2022, NCLA submitted a FOIA request to the SEC seeking "[c]opies of certain records and documents of the Commission related to its April 5, 2022 statement regarding an identified 'control deficiency' within the Commission's system for administrative adjudications." J.A. 37 at ¶3. NCLA's FOIA request contains ten subparts and seeks documents regarding, among other things, the "Commission's determination that 'access to the Adjudication memoranda would not have affected any Enforcement filings'" in *SEC v. Cochran*, No. 21-1239 (S. Ct.), and *Jarkesy v. SEC*, No. 20-61007 (5th Cir.), (subpart 4) and "[a]ny reports, memoranda, or communications produced by BRG related to their review of the control deficiency" (subpart 7). *See* J.A. 38-39 at ¶4.

On January 18, 2023, the SEC's Office of FOIA Services ("FOIA Office") issued an interim partial response to NCLA's FOIA request and released to NCLA 33 pages of records. J.A. 39 at ¶5. The FOIA Office redacted the records in part under FOIA Exemptions 4 and 6, 5 U.S.C. §§ 552(b)(4) and (6). *Id.* In its response, the FOIA Office explained that it would address subpart 10 of the FOIA request in three parts. *Id.* The FOIA Office further explained that its interim partial response addressed NCLA's FOIA request subparts 2, 5, 8, 9, 10(b), and 10(c). *Id.*

On March 22, 2023, the FOIA Office sent a letter to NCLA informing it that, among other things, the SEC had identified approximately 3,700 records,

consisting of approximately 51,700 pages, that may be responsive to the remaining seven subparts of the FOIA request (items 1, 3, 4(a) and (b), 6, 7, and 10(a)). J.A. 39-40 at ¶6; *see also* J.A. 158. The letter also stated that, because the records potentially responsive to this request are voluminous, the FOIA Office would process them in the FOIA Office's Complex track. J.A. 40 at ¶6. The letter stated that, if NCLA was still interested in having the remaining subparts of the request processed, NCLA should contact the FOIA Office and identify the records that should be placed in the Complex track. *Id.*

In March, April, and May 2023, the SEC's counsel and NCLA's counsel discussed ways of narrowing the remaining seven subparts of NCLA's FOIA request (items 1, 3, 4(a) and (b), 6, 7, and 10(a)). J.A. 42 at ¶5. The parties ultimately agreed that the SEC would process two categories of records instead of those seven subparts: (1) the report or reports prepared by Berkeley Research Group (BRG), with all supporting documents, interviews, statements etc. ("First Category"), and (2) the first page of the Order Instituting Proceedings (a public document) of every administrative proceeding in which the "control deficiency" occurred ("Second Category"). *Id.*; *see also* Dkt. No. 15.

On June 23, 2023, the FOIA Office issued a response to the First Category and released to NCLA 55 pages of records. J.A. 40 at ¶7. The records were redacted in part under FOIA Exemptions 5 and 6, 5 U.S.C. §§ 552(b)(5) and (6).

*Id.* The FOIA Office also informed NCLA that it was withholding in full 1,835 pages of records that consisted of attachments to emails pursuant to FOIA Exemptions 5 and 6. *Id.*; J.A. 192 at ¶9. The SEC later determined that that page count of attachments to emails mistakenly did not include the pages from one additional email attachment, specifically an Excel spreadsheet consisting of 587 pages when converted to PDF, so the SEC withheld in full a total of 2,422 pages of attachments. J.A. 192 at ¶9. The documents are all emails between SEC staff and SEC contractors about the SEC's internal review related to the control deficiency issue, and they contain discussions about conducting the internal review. J.A. 43 at ¶7; J.A. 50-68. Many of the emails have attachments with forensic data generated by BRG for use in the internal review. *Id*. One email chain includes consultative discussions about a draft Commission statement and attaches the draft statement. J.A. 43 at ¶7; J.A. 62. The SEC determined that all withheld material from the First Category is protected by the work-product doctrine and the deliberative process privilege. *See* J.A. 43 at ¶8; J.A. 44 at ¶10.

For the Second Category, the SEC initially informed NCLA that it was withholding all the requested documents under Exemption 5. J.A. 46 at ¶21. However, on June 2, 2023, the SEC issued a second statement regarding the control deficiency related to the separation of the SEC's enforcement and adjudicatory functions. *See* U.S. Secs. & Exch. Comm'n, *Second Commission*

*Statement Relating to Certain Administrative Adjudications* (June 2, 2023), https://www.sec.gov/newsroom/speeches-statements/second-commission-statement-relating-certain-administrative-adjudications ("Second Statement"). The Second Statement and its five exhibits provide, among other things, additional information about *Cochran*, *Jarkesy*, twenty-eight additional "Affected Matters" that were pending before the Commission, and sixty-one then-pending matters encompassed by eight "Omnibus Memoranda." *Id.* The Second Statement cites and contains links to the Orders Instituting Proceedings ("OIPs") for each of the twenty-eight "Affected Matters," and Exhibit 5 contains links to the electronic dockets for the sixty-one matters it describes. *Id.*

On June 13, 2023, the SEC's counsel emailed NCLA's counsel to inform them that the Second Statement allowed NCLA to access the OIPs that it was seeking in its Second Category. J.A. 47 at ¶23. The SEC's counsel stated that by citing and providing links to the OIPs and electronic dockets in the Second Statement and its accompanying exhibits, the SEC had provided all documents responsive to the Second Category. *Id.* NCLA's counsel responded that NCLA also sought information about whether any closed, settled, or otherwise disposed-of matters were affected by the control deficiency. *Id.* The SEC's counsel responded that the SEC had provided responsive materials for every administrative proceeding in which it had made a determination that one or more memoranda

relating to the SEC's adjudicatory functions were accessed by staff in the SEC's Division of Enforcement ("Enforcement"). *Id.* The SEC's counsel further stated that to the extent that NCLA sought "the first page of the Order Instituting Proceedings" for additional administrative proceedings, such a request would be an improper FOIA request because it would be asking the SEC to conduct further analysis to determine whether, and in which of those administrative proceedings, Enforcement staff accessed adjudication memoranda. *Id.*

## B. Proceedings Below

### 1. NCLA sued the SEC.

On November 23, 2022, NCLA filed a complaint against the SEC concerning its FOIA request. *See* J.A. 2. On January 11, 2023, NCLA filed an amended complaint. J.A. 3; J.A. 6-15.

The parties agreed that, on summary judgment, the issues to be resolved were the SEC's withholding of information from records responsive to the two categories of records that the parties agreed the SEC would process after the FOIA Office notified NCLA that its request was too voluminous to process outside of the Complex track ((1) BRG reports and supporting documents, and (2) the first page of the OIPs of every administrative proceeding in which the "control deficiency" occurred). J.A. 42 at ¶¶5-6. In light of the parties' subsequent discussions about

the Second Category, the SEC also addressed whether the Commission provided a complete response to the Second Category. J.A. 42-43 at ¶6.

On July 12, 2023, the SEC filed a motion for summary judgment, and the parties completed briefing on August 23, 2023. *Id.* The parties appeared at a motion hearing before Judge Nichols on August 15, 2024. *Id.*

**2. The district court granted the SEC's motion for summary judgment.**

On August 29, 2025, the district court granted the SEC's motion for summary judgment. J.A. 193.

First, the district court found that the SEC had appropriately withheld information under FOIA Exemptions 5 and 6. J.A. 197-202. With respect to FOIA Exemption 5, the district court concluded that the consultant corollary applied to BRG, that the attorney work-product doctrine applied to the withheld information, and that NCLA had provided no evidence that the SEC had waived Exemption 5 protection. J.A. 197-200. Because the district court held that "the attorney work-product doctrine applies," it did not address whether the materials are also covered by the deliberative process privilege. J.A. 200 n.3. With respect to Exemption 6, the district court agreed with the SEC's withholding staff contact information and the names of staff who had access to the databases at issue in the control deficiency and who were being interviewed by the internal review team

based on “reasonably foreseeable” harassment. J.A. 200-202. The district court noted that “NCLA has not identified a public interest in knowing the redacted names.” J.A. 201.

Second, the district court found that the SEC’s declarations as to the search the SEC conducted to identify records responsive to the Second Category were adequate. J.A. 202. The district court also noted that “FOIA does not require agencies to conduct new research, and generate *new* findings, or create new records.” *Id.*

### C. *JARKESY V. SEC*

Two related cases, also involving FOIA requests to the SEC for records relating to the control deficiency, are pending in the Southern District of Texas. *Jarkesy v. SEC* (S.D. Tex. No. 3:22-cv-405); *NCLA et al. v. SEC* (S.D. Tex. 3:23-cv-00402). The FOIA requests at issue in each of the three cases overlap.

The district court in the NCLA Texas case has not yet ruled on whether the SEC’s searches and withholdings were adequate. However, in *Jarkesy*, the district court considered the same documents at issue in the First Category here. *See Jarkesy v. SEC*, No. 3:22-CV-405, 2024 WL 4101811, at *2 (S.D. Tex. July 3, 2024) (parties agreed SEC would release to Jarkesy the records released for NCLA First Category). The court granted the SEC’s motion for summary judgment as to those records “[b]ased on its analysis of Exemptions 5 and 6 and of the

foreseeability of harm." *Id.* at *10. With respect to FOIA Exemption 5, the court found that, under the consultant corollary, Exemption 5 could protect communications between SEC staff and SEC contractors. *Id.* at *5-6. The court also concluded that the deliberative-process privilege and attorney work-product doctrine applied to the withheld information. *Id.* at *6-7. Additionally, the court upheld the SEC's withholdings of SEC staff and contractor contact information and the names and titles of SEC staff whose actions resulted in the control deficiency, who were involved in immediate remedial efforts, who had access to the databases at issue in the control deficiency, or who were interviewed by the internal review team. *Id.* at *8-9.

## STANDARD OF REVIEW

This Court reviews *de novo* the district court's grant of summary judgment in a FOIA case. *Nat'l Sec. Archive v. CIA*, 104 F.4th 267, 271 (D.C. Cir. 2024).

## SUMMARY OF ARGUMENT

The SEC fulfilled its obligations under the FOIA in its responses to the First and Second Categories of records at issue in this case. With respect to the First Category, the SEC's *Vaughn* Index and declarations sufficiently support the SEC's withholdings of information under FOIA Exemptions 5 and 6 as well as the application of the consultant corollary to correspondence between SEC staff and their consultants. The SEC appropriately withheld information about its internal

review of the control deficiency pursuant to the attorney work-product doctrine and the deliberative process privilege. The SEC also correctly withheld the names of certain staff and contact information due to a risk of harassment to those individuals. With respect to the Second Category, the SEC appropriately responded to that request by directing NCLA to publicly available relevant records. The SEC also correctly determined that, to the extent that request seeks identification and release of additional documentation, it is improper.

In contesting the SEC's responses to both categories, NCLA spills much ink over the SEC's correction on reply regarding the total number of pages it withheld in full. This is a distraction from the core issues. With respect to the First Category, the SEC appropriately withheld privileged information from its release and provided adequate supporting documentation. With respect to the Second Category, NCLA guesses about what searches the SEC could potentially conduct. But NCLA fails to show that the record and applicable case law merit a reversal of the district court's grant of summary judgment.

As such, the district court appropriately granted summary judgment for the SEC.

## ARGUMENT

### I. The district court correctly found that the SEC appropriately withheld information from the First Category of records under FOIA Exemptions 5 and 6.

#### A. The SEC can withhold exempt information when responding to FOIA requests.

Under the FOIA, "federal agencies make records available to the public upon request, unless those records fall within one of nine exemptions." *United States Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 263 (2021). To satisfy its burden of proving the applicability of an exemption claimed under the FOIA, the agency "may rely on declarations, a *Vaughn* index, or both." *Chavis v. U.S. Dep't of Just.*, No. 1:20-CV-00638 (TNM), 2021 WL 1668069, at *4 (D.D.C. Apr. 28, 2021). The agency's submissions support summary judgment if they "describe[] the justifications for withholding the information with specific detail, demonstrate[] that the information withheld logically falls within the claimed exemption, and [are] not contradicted by contrary evidence in the record or by evidence of the agency's bad faith." *Am. C.L. Union v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Id.* (internal quotations omitted). Agency affidavits are accorded a presumption of good faith. *Chavis*, 2021 WL 1668069, at *4. Here, the SEC submitted three declarations and

a *Vaughn* Index to support its responses to the FOIA request and provided all the necessary support to substantiate its withholdings. *See* J.A. 37-68, 190-192.

### B. The SEC's *Vaughn* Index and declarations are sufficient.

#### 1. The SEC's *Vaughn* Index and declarations describe all the documents the SEC withheld in response to the First Category.

NCLA levies unfounded complaints about whether the SEC accurately identified how many pages of documents it withheld in full or in part in response to the First Category. *See, e.g.*, Br. 6-8, 13-17. Notably, NCLA raises these claims for the first time on appeal. While it is not necessary to address issues that were not raised in the district court (*see, e.g.*, *Hall v. Larsen*, 46 F. App'x 634, 634 (D.C. Cir. 2002)), NCLA's claims are meritless.

First, NCLA repeatedly states that the *Vaughn* Index does not address thousands of pages the SEC withheld, but that statement is simply wrong. *See* Br. at 7, 8, 11, 13-17, 22 n.15, 28 n.17. The SEC withheld 55 pages of parent emails in part and attachments to those emails in full. *See* J.A. 40 at ¶7; J.A. 43 at ¶¶7-8; J.A. 192 at ¶9. The *Vaughn* Index contains an entry for each parent email/email thread. *See* J.A. 50-68. For each parent email that has one or more withheld attachments, that entry explains what the attachments are, the applicable exemptions, and the bases for withholding the attachments. *See* J.A. 51, 53-55, 57-63, 65-66. Specifically, the Index states that in attachments to emails, forensic data

generated by BRG staff concerning the control deficiency is withheld and refers to "attachments" and "withheld . . . data." *Id.* With respect to a withheld draft Commission statement, the Index explains that "a draft of a Commission statement relating to the control deficiency is withheld." J.A. 62. While the *Vaughn* Index does not specify the number of pages of attachments, the SEC's declaration provides the total number of pages. J.A. 192 at ¶9.

Second, NCLA focuses throughout its brief on the SEC's correction on reply about how many pages of attachments it withheld. *See, e.g.*, Br. at 7, 8, 11, 13-16 , 22 n.15, 31 n.18, 32 n.19. NCLA makes a mountain out of a molehill. To clarify, in response to the First Category, the SEC released 55 pages of parent email records (with redactions) and withheld in full the attachments to those records. *See* J.A. 40 at ¶7. The SEC originally calculated the number of pages of withheld attachments to be 1,835 pages (*id.*), for a total of 1,890 pages of records responsive to the First Category (J.A. 43 at ¶8). The SEC later realized that it had inadvertently omitted one attachment in the attachment page count, and in a declaration filed with its reply in support of its motion for summary judgment, it clarified that "that [the 1,835 page] number does not include the pages to one attachment, an Excel spreadsheet that consists of 587 pages when converted to PDF. The SEC withheld in full 2,422 pages." J.A. 192 at ¶9. The SEC did not

need to update its *Vaughn* Index because the attachments to the parent emails were already included in that Index.[2]

The SEC's declarations are accorded a presumption of good faith (*Chavis*, 2021 WL 1668069, at *4), and the SEC's correction of the number of withheld pages does not undermine the reliability of those declarations. NCLA itself recognizes that, in providing the supplemental declaration, the SEC *corrected* its counting mistake. *See* Br. at 7 ("[t]he SEC later corrected itself"). NCLA points to no prejudice caused by the SEC's correction.[3]

[2] NCLA claims that the SEC "on yet another occasion claimed the proper figure was 1,855" pages (Br. at 16 n.11), but NCLA cites the district court's opinion, not an SEC submission (J.A. 196).

[3] In a footnote to its Statement of the Case, NCLA complains that in its case in the Southern District of Texas, "the SEC maintained for nearly two years that at the very least 53,000 pages of records were responsive," but later determined "that fewer than 2,000 pages of records were actually responsive." Br. at 6 n.7. NCLA claims that the SEC took similar positions in this case. This footnote fails to recognize the difference between how many pages of records *may* be responsive based on a preliminary search for records and how many pages of records *are actually* responsive after the records are reviewed. In this case, the FOIA Office informed NCLA that it "had identified approximately 3,700 records . . . that *may be responsive*." J.A. 39-40 at ¶6 (emphasis added).

### 2. The descriptions in the SEC's *Vaughn* Index and declarations provide the necessary information to address the SEC's withholding decisions.

NCLA argues that the *Vaughn* Index and declarations are insufficient to justify the SEC's withholdings. *See* Br. at 13-22. Those arguments, however, largely ignore the content of the *Vaughn* Index and declarations. The SEC has satisfied its obligations under the FOIA because the *Vaughn* Index and its declarations "contain an adequate description of the records and a plain statement of the exemptions relied upon." *Amiri v. Nat'l Sci. Found.*, 664 F. Supp. 3d 1, 13 (D.D.C. 2021) (internal quotations omitted), *aff'd*, No. 21-5241, 2022 WL 1279740 (D.C. Cir. Apr. 28, 2022).

First, NCLA protests that the "SEC collapsed the two standards" of attorney work-product doctrine and the deliberative process privilege in the Tallarico Declaration. Br. at 16. Not only does NCLA provide no explanation as to why multiple privileges cannot apply to the same withheld information, but NCLA also ignores that the SEC separately explained why those two privileges apply in both the Tallarico Declaration and the *Vaughn* Index. *See* J.A. 43-46 at ¶¶7-16; J.A. 50-68.[4]

[4] The SEC's withholdings under Exemption 5, as well as NCLA's complaints about the SEC's descriptions of information withheld under the deliberative process privilege, are discussed *infra* at Parts C and C.3.

Second, NCLA argues that the SEC's *Vaughn* Index is improperly categorical (*see* Br. at 17-19), but that is not true. The *Vaughn* Index contains an entry for each parent email/thread and any attachments thereto. *See* J.A. 50-68. NCLA provides no support for its apparent position that the *Vaughn* Index must separately address each attachment. NCLA complains only that the *Vaughn* Index does not make sufficiently clear whether the "consultations were between subordinates and superiors" (Br. at 18), which is addressed *infra* at Part C.3.

Third, NCLA complains that the SEC used repeated explanations in its *Vaughn* Index to justify its withholdings (Br. at 7, 19), but "the fact that there are repeat phrases and similar explanations to characterize the information is not sufficient to claim that there was a lack of specificity in the *Vaughn* Index, as repetitive language is expected if the withheld records relate to the same subject matter." *Energy Pol'y Advocs. v. SEC*, No. CV 23-507 (RC), 2024 WL 4512386, at *6 (D.D.C. Oct. 17, 2024); *see also Hall & Assocs. v. U.S. EPA*, 633 F. Supp. 3d 55, 73 (D.D.C. 2022) (approving *Vaughn* index where "many [] entries contain the same language . . . because many of the withheld documents are similar").

**C. The SEC properly withheld information under Exemption 5.**

Exemption 5 exempts from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Courts have

interpreted Exemption 5 to cover "the privileges available to Government agencies in civil litigation," which includes the attorney work-product doctrine and the deliberative process privilege. *Sierra Club*, 592 U.S. at 267.

**1. The SEC properly determined that communications with BRG and General Dynamics were intra-agency communications.**

NCLA claims that the communications at issue are not intra-agency because the district court relied on the consultant corollary, which is "atextual." Br. at 37-39. NCLA also argues that BRG and General Dynamics could not be SEC contractors because they should have, but did not, "report[] malfeasance to the Inspector General" and instead "evade[d] the Inspector General Act." *Id*. at 39-40. These arguments fail.

In *Klamath*, the Supreme Court recognized that certain Courts of Appeals had adopted the consultant corollary and that "the fact about the consultant that is constant in the typical cases is that the consultant did not represent an interest of its own, or the interest of any other client, when it advise[d] the agency that hire[d] it." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 9-11 (2001). This Court has approved the use of the consultant corollary. *See, e.g.*, *McKinley v. Bd. of Governors of the Fed. Reserve Sys.*, 647 F.3d 331, 336 (D.C. Cir. 2011) ("intra-agency" includes "'agency records containing comments solicited from nongovernmental parties'"); *Georgia v. U.S. Dep' of Just.*, 148 F.4th

724, 734 (D.C. Cir. 2025) (in "line of decisions [that] began over 50 years ago" this Court has "continued applying the consultant corollary to protect materials exchanged with non-agency outsiders under Exemption 5");[5] *Nat'l Inst. of Mil. Just. v. U.S. DOD*, 404 F. Supp. 2d 325, 343-44 (D.D.C. 2005) (citing *Klamath* and D.C. Circuit cases and noting that "[t]he Supreme Court has made clear that Exemption 5 protects not only inter-agency and intra-agency communications among employees, but also communications from outside consultants or other individuals hired or solicited by an agency for their views"), *aff'd*, 512 F.3d 677 (D.C. Cir. 2008). Although NCLA contends that the "consultant corollary is found nowhere in the [FOIA's] text" (Br. at 37-38), this Court has recognized that "'[i]n the course of its day-to-day activities, an agency often needs to rely on the opinions and recommendations of temporary consultants, as well as its own employees,' and it is 'entirely reasonable' to adopt a 'common sense interpretation of "intra-agency"' that encompasses the advice submitted by such temporary consultants." *Nat'l Inst. of Mil. Just. v. U.S. DOD.*, 512 F.3d 677, 684-85 (D.C. Cir. 2008) (quoting *Ryan v. Dep't of Justice*, 617 F.2d 781, 789-90 (D.C. Cir. 1980)).

---

[5] NCLA notes that the district court decision that this Court reviewed in *Georgia* "refused to expand" the consultant corollary. Br. at 38. Not only does the consultant corollary need no expanding to apply in this case, but also that district court opinion was reversed in principal part, and this Court clarified that *Georgia* "is not a consultant-corollary case." *Georgia*, 148 F.4th at 729, 729, 738.

Here, the SEC showed that it solicited the advice and assistance of BRG and General Dynamics and that these consultants' "only obligations [were] to truth and [their] sense of what good judgment calls for, and in those respects . . . function[ed] just as an employee would be expected to do." *Klamath*, 532 U.S. at 11. With respect to BRG, the SEC retained them to support its internal review relating to the control deficiency. J.A. 44 at ¶11. During the internal review, BRG contractors compiled forensic data and engaged in discussions with SEC staff as part of SEC staff's review of certain databases to assess the scope and potential impact of the SEC's control deficiency. *Id.* BRG conducted forensic analysis at the request of the SEC and to support the SEC's work. *Id.* BRG had no interest related to the SEC's control deficiency other than providing assistance pursuant to its contract with the SEC. *Id.* Similarly, with respect to General Dynamics, the SEC retained General Dynamics to support the SEC's OIT. J.A. 44 at ¶12. During the internal review, General Dynamics contractors helped OIT staff provide information to BRG and the review team so that BRG could conduct its forensic analysis. *Id.* General Dynamics contractors performed this work at the request of OIT and to support the SEC's work. *Id.* General Dynamics was not retained to assist with the internal review and had no interest related to the SEC's control

deficiency other than providing assistance to OIT pursuant to its contract with the SEC. *Id.*[6]

NCLA claims that the consultant corollary should not apply here as BRG and General Dynamics "did not behave 'just as an employee of the agency'" because, if BRG and General Dynamics were really behaving like employees, they would have "reported malfeasance to the Inspector General." Br. at 39-40. Whether BRG or General Dynamics should have reported anything to the Inspector General is irrelevant to the application of the consultant corollary. The relevant consideration is whether a consultant has an interest in the underlying issue, and NCLA points to no evidence that BRG or General Dynamics has any interest in the control deficiency issue. *Elec. Priv. Info. Ctr. v. DHS*, 892 F. Supp. 2d 28, 44-46 (D.D.C. 2012) (consultant corollary applied where consultants "bound in contract to provide information and analysis"). In any event, NCLA has shown no evidence to support its assertion that BRG and General Dynamics "evade[d] the Inspector General Act." Br. at 40. NCLA does not identify any provision of the Inspector General Act, 5 U.S.C. § 401 *et seq.*, or any other law that would preclude the

[6] NCLA mischaracterizes the roles that BRG and General Dynamics held in relation to the internal review. *See, e.g.*, Br. at 4 (claiming that SEC hired BRG to "conduct" internal review and "outsourced" to General Dynamics and investigation was "contractor-led"), 40 (same). NCLA provides no support for its claims that the contractors conducted, as opposed to supported, the internal review.

SEC's OGC from conducting the internal review separately from any Inspector General investigation.[7]

NCLA similarly provides no reason to believe that its claim that the SEC "hire[d] its own favored vendors" to keep its "investigation[] secret from the public" is true or relevant. Br. at 40. As NCLA admits, "the 'control deficiency' was publicly acknowledged by [the] SEC and announced . . . four years ago." Br. at 9; *see also id.* at 28; April 5, 2022 Statement; Second Statement. Moreover,

---

[7] NCLA states that "[t]here is no evidence . . . whether the SEC Inspector General has ever investigated SEC's 'control deficiency.'" Br. at 3-4. This is incorrect. The SEC's OIG discussed its investigation of the control deficiency in its Semi-Annual Report to Congress for April 1, 2023 through September 30, 2023. *See* U.S. SECS. & EXCH. COMM'N OFF. OF INSPECTOR GEN., SEMIANNUAL REPORT TO CONGRESS 04.01.23 to 09.30.23 at 12-13, https://www.sec.gov/files/semiannual-report-congress-april-1-2023-through-september-30-2023.pdf ("Report"). Additionally, in response to NCLA's FOIA request at issue in the Southern District of Texas, the SEC released the OIG's 28-page report of investigation about the control deficiency (with limited redactions) and records showing SEC staff discussed the control deficiency with OIG. *See NCLA et al. v. SEC.* (3:23-cv-00402) (S.D. Tex.), Dkt. No. 19 at ¶¶7, 10.

NCLA provides no support for its claims that the SEC did not "allow[] the Inspector General to investigate agency misconduct," that the SEC did not cooperate with the OIG investigation, or that SEC contractors failed to "report[] malfeasance" to the OIG. *See* Br. at 4, 40. Notably, the OIG "did not find intentional misconduct" in connection with the control deficiency and did not indicate that the SEC did anything improper in conducting the internal review and determining the impact of the control deficiency on administrative proceedings. Report at 12-13.

NCLA provides no basis for finding that the consultant corollary would not apply if an investigation was not disclosed to the public.

### 2. The SEC properly withheld information under the attorney work-product doctrine.

The attorney work-product doctrine protects records prepared in anticipation of litigation "by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." *McKinley*, 647 F.3d at 341 (internal quotations omitted); *see also* Fed. R. Civ. P. 26(b)(3) (codifying privilege). For purposes of the attorney work-product doctrine, "[w]hile litigation need not be imminent or certain in order to satisfy the anticipation-of-litigation prong of the test, this circuit has held that at the very least some articulable claim, likely to lead to litigation, must have arisen, such that litigation was fairly foreseeable at the time the materials were prepared." *Hertzberg v. Veneman*, 273 F. Supp. 2d 67, 75 (D.D.C. 2003) (internal quotations omitted).

Here, the SEC asserts the attorney work-product doctrine over all withheld material from the First Category. *See* J.A. 50-68. The internal review of the control deficiency was conducted by SEC staff and contractors at the direction and under the supervision of SEC attorneys in OGC in anticipation of litigation involving SEC enforcement actions tied to the control deficiency. J.A. 44 at ¶10.

During the internal review, BRG contractors compiled forensic data and engaged in discussion with SEC staff as part of SEC staff's review of certain databases to assess the scope and potential impact of the SEC's control deficiency. *See* J.A. 44 at ¶11; J.A. 50-68. Courts have found that information gathered and prepared by persons working under the direction of lawyers, including in internal agency investigations, is appropriately withheld pursuant to the attorney work-product doctrine. *See, e.g.*, *Jud. Watch, Inc. v. U.S. DOJ*, 806 F. App'x 5, 7 (D.C. Cir. 2020) (holding that DOJ "adequately demonstrated that the [FBI forms used by FBI agents] fit within the attorney work-product privilege" where forms were obtained because of prospect of litigation and work was conducted under attorney direction); *Leopold v. U.S. DOJ*, 487 F. Supp. 3d 1, 11-12 (D.D.C. 2020) (noting that "in the FOIA context, the District of Columbia Circuit has long held that documents prepared by non-attorneys in anticipation of litigation may also be protected by the privilege" and holding attorney work-product privilege applied to FBI interview-related records prepared by law enforcement agents) (cleaned up).

The record also makes clear that the SEC's internal review was undertaken with an eye toward possible litigation, as litigation related to or arising from the control deficiency was reasonably foreseeable. The control deficiency relates "to the separation of enforcement and adjudicatory functions within the agency's system for administrative adjudication." *See* Second Statement. Specifically, "for

a period of time, certain databases maintained by [the SEC's] Office of the Secretary ('OS') were not configured to restrict access by staff from [the SEC's] Division of Enforcement ('Enforcement') to memoranda drafted by staff from the Adjudication Group ('Adjudication') in [the SEC's] Office of the General Counsel ('OGC')." *Id.* Litigation relating to the control deficiency was foreseeable at the time of the internal review because the SEC recognized that parties in affected administrative proceedings might raise claims in the administrative proceedings, in appeals from those proceedings, or in independent cases in federal courts. J.A. 44 at ¶13. Indeed, recognizing the connection to ongoing litigation, following the issuance of the April 5, 2022 Statement, the Department of Justice submitted information regarding the control deficiency to the courts in which the litigation referred to in the April 5, 2022 Statement was pending.[8] As NCLA represented Cochran in her case against the SEC, NCLA is well aware of the relevance of these matters to litigation. *See SEC Enforcement Staff Accessed Adjudicatory Documents in Midst of Administrative Proceedings*, NCLA (Apr. 6, 2022),

[8] *See, e.g.,* Letter from the Solic. Gen., *SEC v. Cochran*, No. 21-1239 (S. Ct. Apr. 8, 2022), https://www.supremecourt.gov/DocketPDF/21/21-1239/220641/20220408165202974_Letter%2021-1239%20final.pdf; Notice of Supplemental Auth., *Jarkesy v. SEC*, No. 20-61007, Dkt. No. 117 (5th Cir. Apr. 5, 2022).

https://nclalegal.org/press_release/sec-enforcement-staff-accessed-adjudicatory-documents-in-midst-of-administrative-proceedings/.

On appeal, NCLA's complaint with the SEC's assertion of the attorney work-product doctrine centers entirely on withheld forensic data generated by BRG. *See* Br. at 19-22. First, NCLA protests that the district court did not conduct a segregability analysis of the withheld information. Br. at 19-20. Courts have recognized, however, that "[i]f a document is fully protected as work product, then segregability is not required." *Jud. Watch, Inc. v. U.S. DOJ*, 432 F.3d 366, 371 (D.C. Cir. 2005). Nevertheless, SEC staff reviewed the records responsive to the First Category to determine whether any portions of those records could be segregated for public disclosure. J.A. 46 at ¶19. SEC staff have provided all non-exempt information that could be segregated from exempt information. *Id*.

NCLA also argues that the SEC should not be permitted to withhold "purely factual data" from "multi-purpose documents." *See* Br. at 19-22. NCLA, however, provides no reason to treat the documents at issue as "multi-purpose documents." As stated above, the internal review of the control deficiency was conducted by SEC staff and contractors at the direction and under the supervision of SEC attorneys in OGC in anticipation of litigation involving enforcement actions tied to the control deficiency. J.A. 44 at ¶10. In addition, as NCLA's cited case explains (Br. at 21), the work product doctrine can protect factual data: the

doctrine "'does not distinguish between factual and deliberative material.'" *Shapiro v. U.S. Dep't of Just.*, 969 F. Supp. 2d 18, 28 (D.D.C. 2013) (internal citations and quotations omitted). "[F]actual material is itself privileged when it appears within documents that are attorney work product." *Jud. Watch*, 432 F.3d at 371. As such, data and analysis provided by BRG are protected by the attorney work-product doctrine. *Georgia*, 148 F.4th at 735 ("Allowing FOIA to reach materials such as . . . computer data . . . would drain Exemption 5 of its protective purpose.").

Additionally, even if the internal review was conducted both because of the prospect of litigation and to address matters arising in the ordinary course of business, the attorney work-product doctrine would protect the documents at issue. *See EEOC v. Lutheran Soc. Servs.*, 186 F.3d 959, 968-69 (D.C. Cir. 1999) (report prepared by counsel who conducted investigation covered by attorney work-product doctrine "because [respondent] feared litigation" and court noted that "even if [respondent undertook its investigation in ordinary course of business], [petitioner's] recharacterization of [respondent's] motivation does nothing to undermine [respondent's] contention that it genuinely feared litigation").

NCLA does not argue that that there was no prospect of litigation here; nor can it, as NCLA's district court filings show that the SEC had good reason to address the control deficiency issues in anticipation of litigation involving

enforcement actions tied to the control deficiency. *See* J.A. 106, 108 (confessing that Michelle Cochran, for whom NCLA "had served as counsel," had planned to "file a complaint in district court" before the SEC dismissed her administrative case in June 2023); J.A. 149 at ¶21 (admitting "SEC anticipated facing legal consequences"). Because BRG generated the data for SEC staff conducting a review at the direction of OGC in the context of foreseeable litigation, the attorney work-product doctrine applies to those records.

#### 3. The SEC properly withheld information under the deliberative process privilege.

The deliberative process privilege applies to material that is both predecisional and deliberative. *See Sierra Club*, 592 U.S. at 268. "Documents are 'predecisional' if they were generated before the agency's final decision on the matter, and they are 'deliberative' if they were prepared to help the agency formulate its position." *Id.* The deliberative process privilege protects "from disclosure documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Id.* at 267 (internal quotation marks omitted). "To encourage candor, which improves agency decisionmaking, the privilege blunts the chilling effect that accompanies the prospect of disclosure." *Id*. The privilege "protect[s] agencies from being 'forced to operate in a fishbowl.'" *Id.* The

deliberative process privilege "calls for . . . the withholding of all papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be." *Elec. Frontier Found. v. U.S. DOJ*, 739 F.3d 1, 7 (D.C. Cir. 2014) (internal quotations omitted). Courts allow agencies to withhold factual information when it "'is so inextricably intertwined with the deliberative sections of documents that its disclosure would inevitably reveal the government's deliberations.'" *Elec. Priv. Info. Ctr.*, 892 F. Supp. 2d at 47.

As detailed in the *Vaughn* Index, the SEC withheld information in the First Category under the deliberative process privilege, as well as under the work-product doctrine. *See* J.A. 50-68. The withheld information consists of pre-decisional discussion and analysis concerning the agency's review of the control deficiency. *See id.*; J.A. 43 at ¶8. Specifically, the withheld information is predecisional because the analysis occurred prior to final agency decisions or findings concerning the internal review as reflected in the Second Statement. *See* Second Statement; J.A. 43-45 at ¶¶8-9, 15 ("confidential discussions and the data generated from the discussions . . . formed the basis for advice conveyed to SEC officials who needed to decide what actions to take in light of the internal review").

The withheld information is also deliberative, because, as the *Vaughn* Index and declarations make clear, it reflects SEC staff deliberations concerning their review of the control deficiency prior to the agency's final findings about what

actions to take in administrative proceedings as a result of the control deficiency. *See* J.A. 50-68; J.A. 43 at ¶8; J.A. 44 at ¶11. In the withheld records, SEC staff and contractors compile and discuss forensic data used to assess the scope and potential impact of the SEC's control deficiency. *See* J.A. 43 at ¶7; J.A. 44 at ¶11.

The *Vaughn* Index reflects that the parent emails contain "information about" and "discussions concerning" review "of certain databases to assess the scope and potential impact of the SEC's control deficiency." *See* J.A. 50-68. The Index describes emails that "address the review of the handling and processing" of the *Cochran* and *Jarkesy* proceedings. J.A. 50, 58. The withheld information relates to significant policy issues about continuing to litigate administrative proceedings affected by the control deficiency, and the withheld information is deliberative because requests from SEC staff for various categories of data and discussions of the requests reflect deliberations among SEC staff about what to focus on and how to conduct the internal review. Courts have found that this type of discussion is appropriately withheld pursuant to the deliberative process privilege. *Reliant Energy Power Generation, Inc. v. FERC*, 520 F. Supp. 2d 194, 203 (D.D.C. Oct. 5, 2007) (deliberative process privilege applied to records with substantive discussion of issues under investigation and spreadsheets and tables analyzing raw data), *report and recommendation adopted*, 520 F. Supp. 2d 194 (D.D.C. Nov. 8, 2007); *Elec. Priv. Info. Ctr. v. U.S. DOJ*, 320 F. Supp. 3d 110, 119

(D.D.C. 2018) ("The deliberative process privilege protects a compilation of factual material 'assembled through an exercise of judgment in extracting pertinent material from a vast number of documents for the benefit of an official called upon to take discretionary action.'").

The Index also describes withheld attachments that contain "forensic data generated by BRG staff" as part of their review. *Id.* at 51, 53-55, 57-61, 63, 65-66. That data reflects deliberations among SEC staff and contractors about what information to compile and examine during the review. *See Reliant*, 520 F. Supp. 2d at 206 ("use [of data analysis documents] by agency employees in writing the Staff Report renders them part of the deliberative process").

The SEC also withheld portions of an email containing discussions concerning a draft of a Commission statement relating to the control deficiency, as well as the draft that was discussed. *See* J.A. 62; J.A. 43 at ¶9. Specifically, the records reflect discussions, edits, and recommendations concerning the draft statement. *Id*. Courts have found that internal correspondence between agency staff about draft agency documents as well as the draft document itself are appropriately withheld pursuant to the deliberative process privilege. *See Techserve Alliance v. Napolitano*, 803 F. Supp. 2d 16, 27 (D.D.C. 2011) (D.C. "Circuit has held that draft documents likely are to be protected under the deliberative process privilege because draft documents, by their very nature, are

typically pre-decisional and deliberative.") (internal quotations omitted); *Lewis v. U.S. Dep't of Treasury*, No. 17-cv-0943 (DLF), 2020 WL 1667656, at *7 (D.D.C. Apr. 3, 2020) (Exemption 5 applied to draft documents "prepared to help [agency] officials finalize the language in the agency's proposed rulemaking" that "contain[ed] comments and redline edits . . . reflect[ing] the give-and-take of the consultative process between [agency] officials regarding what material the final document should include") (cleaned up), *aff'd*, 851 F. App'x 214 (D.C. Cir. 2021).

NCLA makes three arguments regarding the deliberative process privilege. First, as noted above, NCLA complains that because the *Vaughn* Index identifies individuals as "Staff," it does not "explain whether consultations were between subordinates and superiors." Br. at 18. Tellingly, NCLA does not identify any specific document where there is any confusion as to whether a communication represented a decision as opposed to ongoing deliberations about how to proceed with the SEC's internal review. Moreover, the Tallarico Declaration states that the records in the First Category are "all emails between SEC staff and SEC contractors about the SEC's internal review related to the control deficiency issue, and they contain discussions about conducting the internal review." J.A. 43 at ¶7. To the extent NCLA needs names (and it has not shown that it does), the names of the individuals who sent and received each email appear in the released records, and the SEC explained that "[t]he documents are all emails between SEC staff and

contractors about the SEC's internal review." J.A. 46 at ¶17. Finally, the context makes clear that the SEC's Chairman and Commissioners were not parties to the emails, and the Chairman and Commissioners were responsible for the final decision of how to address the litigation issues the control deficiency presented. SEC staff and contractors conducted the internal review at the Chairman's request to "assess the scope and impact of the control deficiency" to provide information to OGC and ultimately to the Commission, i.e., the Chairman and Commissioners. *See* April 5, 2022 Statement; Second Statement; *see also* J.A. 43 at ¶8 ("records reflect SEC staff's consultative discussions before final agency decisions or findings had been made concerning the Commission's internal review").

Second, NCLA states that "[t]he District Court was required to examine whether this data or other factual material could be segregated from any deliberative or otherwise protected material." Br. at 19-20. As discussed, the district court determined that the work-product doctrine applies and did not reach the deliberative process privilege (J.A. 200 n.3), and "segregability is not required" for records "fully protected as work product." *Jud. Watch*, 432 F.3d at 371. And "if a district court has not adequately addressed segregability, [the Circuit Court] may do so in the first instance." *Machado Amadis v. U.S. Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020).

Third, NCLA argues for the first time that the district court should have determined "whether the government-misconduct exception to the deliberative process privilege applied." Br. at 21-22. Not only did NCLA forfeit this argument by not bringing it in the district court, but NCLA also provides no factual basis for applying the exception here. "[I]t is not clear in this circuit whether a government misconduct exception may properly be invoked in a FOIA case." *Ctr. for Pub. Integrity v. U.S. Dep't of Def.*, 486 F. Supp. 3d 317, 331-32 (D.D.C. 2020). But "[d]istrict courts in this circuit that have considered whether to apply the government misconduct exception have found that a plaintiff must meet a high bar to properly invoke it." *Id.* at 332. "The relevant consideration for 'extreme government wrongdoing' sufficient to trigger the exception is the egregiousness of the contents of the discussion, not the egregiousness of the underlying conduct that the discussion concerns." *Id.* NCLA has provided no evidence that the withheld information here, namely analysis, forensic data, and a draft document concerning the internal review of the control deficiency, reflects any government wrongdoing or a corrupt decision-making process at the SEC. As such, no exception applies to the deliberative process privilege here.

### D. The SEC properly withheld information under Exemption 6.

The FOIA prevents disclosure of "personnel files and medical files and similar files the disclosure of which would constitute a clearly unwarranted

invasion of personal privacy." 5 U.S.C. § 552(b)(6). To withhold information under Exemption 6, an agency must first establish that the information is contained in personnel, medical, or "similar" files. *See Reliant*, 520 F. Supp. 2d at 207. If the information meets that threshold, a court assesses whether disclosure would lead to a "clearly unwarranted invasion of personal privacy." *See id*. Specifically, "the court must undertake a balancing of the public interest in disclosure on the one side and the individual's interest in privacy on the other." *Id.* (internal quotations omitted).

The records at issue here are in "similar files." "The Supreme Court has held that Congress intended the words 'similar files' to be interpreted broadly." *Reliant*, 520 F. Supp. 2d at 207. Exemption 6 is not limited to personnel or medical files; it covers any "'detailed Government records on an individual which can be identified as applying to that individual.'" *Gov't Accountability Project v. U.S. Dep't of State*, 699 F. Supp. 2d 97, 105 (D.D.C. 2010). Exemption 6 also covers not just the files themselves, but also "'bits of personal information, such as names and addresses, the release of which would create a palpable threat to privacy.'" *Telematch, Inc. v. U.S. Dep't Agric.*, 45 F.4th 343, 351 (D.C. Cir. 2022). Because the SEC is withholding SEC staff and contractor email addresses and phone numbers as well as the names of SEC staff who either had access to the databases at issue in the control deficiency or were interviewed by the internal

review team, the information is deemed to be in "similar files." *See* J.A. 50-68; J.A. 46 at ¶17.

Next, to determine whether disclosure of information would constitute a clearly unwarranted invasion of personal privacy, courts ask "'whether disclosure would compromise a substantial, as opposed to a *de minimis*, privacy interest'" and, if so, "'balance the privacy interest in non-disclosure against the public interest.'" *Telematch*, 45 F.4th at 351. Two categories of information are at issue here. First, SEC staff and contractors have a privacy interest in their email addresses and phone numbers even if their identity is disclosed. *See* J.A. 46 at ¶¶17-18; J.A. 50-68. Release of their email addresses and phone numbers would unnecessarily expose personal information to the public and could lead to harassment by people who believe the internal review could have been handled differently or who are upset by the control deficiency. *See* J.A. 46 at ¶¶17-18; J.A. 50-68. Second, SEC staff who either had access to the databases at issue in the control deficiency or were interviewed by the internal review team have a privacy interest. *See id.* Despite the absence of any finding that they acted in bad faith or should have been aware that they were taking improper steps, they could be harassed as a result of having some connection to the control deficiency, and releasing their names would "unnecessarily expos[e]" them to the public. *See* J.A. 46 at ¶18. Courts have protected employee names and contact information under

Exemption 6 in analogous situations. *See, e.g.*, *Davidson v. United States*, 264 F. Supp. 3d 97, 115 (D.D.C. 2017) (Exemption 6 covers personal information "the release of which would 'create a palpable threat to privacy'"), *aff'd*, 728 F. App'x 7 (D.C. Cir. 2018).

NCLA does not argue that the potential for harassment would not constitute a significant privacy interest. It argues only that the SEC has not provided sufficient evidence that harassment could occur. Br. at 23. Courts, however, have found that individuals have a privacy interest in information that could lead to them being harassed if released where the circumstances suggest they could be harassed and release would not shed light on government activities. *See, e.g.*, *Davidson*, 264 F. Supp. 3d at 110, 115-16 (concluding individuals have substantial privacy interest in their names and personal contact information where agency withheld information to avoid "unwanted attention for the employee"); *Nova Oculus Partners, LLC v. U.S. SEC*, 486 F. Supp. 3d 280, 290 (D.D.C. 2020) (SEC appropriately withheld under Exemption 6 identifying information of SEC staff); *Horvath v. U.S. Secret Serv.*, 419 F. Supp. 3d 40, 47 (D.D.C. 2019) ("agents interviewed in the investigation have a substantial privacy interest in withholding information that would associate them with internal agency investigations and threatens to identify them as witnesses to alleged workplace misconduct") (cleaned up); *Cotton v. Adams*, 798 F. Supp. 22, 26 (D.D.C. 1992) ("individuals named as

witnesses or as subjects of an investigation . . . have a discernible privacy interest in . . . avoiding the embarrassment and potential harassment that may result from public disclosure of their association with the Inspector General's inquiry") (internal citation omitted).[9]

To overcome a privacy interest, it is the requester's obligation to articulate a public interest. *See Reliant*, 520 F. Supp. 2d at 207 ("If the requesting party cannot demonstrate a public interest in disclosure then the court will not order disclosure, because, as this Circuit has noted, 'something, even a modest privacy interest, outweighs nothing every time.'"). Under the FOIA, the only relevant public interest is whether disclosing personal information would shed light on governmental activities or operations. *Davidson*, 264 F. Supp. 3d at 115-16.

NCLA has not identified any public interest that outweighs the privacy interest. The only explanation NCLA provides is factually incorrect; NCLA misrepresents the withheld information by stating that "the government withheld names of individuals who were so influential they are conducting an internal

[9] NCLA points to *Hum. Rts. Def. Ctr. v. U.S. Park Police*, 126 F.4th 708 (D.C. Cir. 2025) (Br. at 23), but that case is distinguishable. There, this Court found that an agency could not withhold the names of agency employees because the agency's privacy assertions were "wholly conclusory, lacking even minimal substantiation of the officers' privacy interest or the potential harm from disclosing their names." *Id.* at 715. That case "has no bearing on whether Exemption 6 may be used to withhold employee names as a general matter." *Power the Future v. U.S. Dep't of State*, No. 24-346 (RC), 2025 WL 343175, at *8 n.4 (D.D.C. Jan. 30, 2025).

review of SEC malfeasance and are apparently influencing the government's policy." Br. at 23 (internal quotations omitted). But the SEC withheld only "the names of SEC staff who were involved in the internal review, either as individuals who had access to the databases at issue in the control deficiency or as individuals being interviewed by the internal review team." J.A. 46 at ¶17. The SEC did not withhold the names of the SEC staff and contractors who conducted the internal review. *Cf. id*.

Not only has NCLA failed to articulate a public interest, but also it could not do so. Releasing contact information and the names of people with access to the databases at issue in the control deficiency or who were interviewed during the review would not shed light on the SEC's activities or operations. J.A. 46 at ¶18; *Cotton*, 798 F. Supp. 2d at 27 ("Courts have routinely held that there is no great public interest in the alleged malfeasance or negligence of agency employees who do not occupy high-ranking positions of public trust."); *Power The Future*, 2025 WL 343175, at *9 ("'generally accepted in this circuit that the public interest in the identities of low-level employees does not usually outweigh the individuals' privacy rights'").

With respect to contact information, courts have recognized that there is rarely a public interest that outweighs the privacy interest in contact information. *See Hall & Assocs. v. U.S. EPA*, No. 19-1095 (RC), 2020 WL 4673411, at *6

(D.D.C. Aug. 12, 2020) ("the interest in controlling the dissemination of a private [non-public] email address outweighs the virtually nonexistent public interest in disclosure"); *Waterman v. IRS*, 288 F. Supp. 3d 206, 211-12 (D.D.C. 2018) ("contact information for individual [agency] employees sheds little light on an agency's performance of its statutory duties, yet exposes individual employees to threatening or harassing contacts from the public") (internal citation and quotation omitted), *vacated on other grounds*, 755 F. App'x 26 (D.C. Cir. 2019), *remanded*, 2021 WL 4262722 (D.D.C. Sept. 20, 2021). NCLA's cited cases (Br. at 25-26) do not counsel otherwise. *See Prechtel v. FCC*, 330 F. Supp. 3d 320, 329 (D.D.C. 2018) (ordering release of email addresses of "bulk submitters" with "ample indication that their email addresses could be made public, mitigating any expectation of privacy" and who were specifically warned that their names and addresses would be publicly available online and released); *Kleinert v. BLM*, 132 F. Supp. 3d 79, 95-97 (D.D.C. 2015) (focusing on withholding of agency staff names because plaintiff "expressly disavowed" seeking email addresses and agency "wholly failed to explain why disclosure of the redacted information would subject the relevant individuals to . . . harms"); *Leadership Conf. on C.R. v. Gonzales*, 404 F. Supp. 2d 246, 257 (D.D.C. 2005) (agency withheld both names and contact information, which were "already publicly available from the Office of Personnel Management"); *Brown v. FBI*, 873 F. Supp. 2d 388, 402-04 (D.D.C.

2012) (concluding that employee names and phone numbers were appropriately withheld under FOIA Exemption 7(C) and "*[a]ny* amount of privacy expectation outweighs the virtually nonexistent public interest"); *United for FBI Integrity v. U.S. Dep't of Just.*, No. CV 22-2885 (RC), 2024 WL 961001, at *1 (D.D.C. Mar. 6, 2024) (records at issue concerned individual's "retirement and any possible allegations of misconduct" against him, not dispute about agency staff names and contact information).

For the names that the SEC has withheld—individuals who had access to the databases at issue in the control deficiency or were interviewed by the internal review team—NCLA cannot demonstrate any public interest in knowing those names. NCLA has provided no evidence of any finding of bad faith or misconduct by any person who had access to the databases or who was interviewed. Indeed, the Inspector General reported that she "did not find intentional misconduct." Report at 13. In arguing that names should be released, NCLA relies on cases (Br. at 24-25) that are factually distinguishable from the present circumstances. *Stern v. F.B.I.*, 737 F.2d 84, 86 (D.C. Cir. 1984) ("FBI may withhold the identities of two of the censured employees under Exemption 7(C)" but ordered to release name of "high level official found to have participated knowingly in the cover-up" of "illegal FBI surveillance activities"); *Charles v. Off. of the Armed Forces Med. Exam'r*, 935 F. Supp. 2d 86, 96-99 (D.D.C. 2013) (ordering release of autopsy

reports and medical records, not names or contact information, where no evidence that family members could connect which redacted records relate to their deceased family member); *People for the Am. Way Found. v. Nat'l Park Serv.*, 503 F. Supp. 2d 284, 305-06 (D.D.C. 2007) (ordering disclosure of names of members of the public "who submitted unsolicited email comments to defendant concerning the proposed change of the video on display at the Lincoln Memorial"); *Lardner v. U.S. Dep't of Just.*, No. 1:03-CV-0180(JDB), 2005 WL 758267, at *16-19 (D.D.C. Mar. 31, 2005) (ordering release of, among others, names of unsuccessful pardon applicants because no risk of additional professional embarrassment beyond original criminal conviction and release would shed light "on the exercise of the pardon power in important ways"); *Lardner v. U.S. Dep't of Just.*, 398 F. App'x 609, 611 (D.C. Cir. 2010) (unsuccessful clemency applicants informed that information might be released "to neighbors and employers, among others, in the course of investigating an applicant's suitability for a pardon").

### E. The SEC conducted a segregability analysis and reasonably foresaw that disclosure of withheld information would harm interests protected by Exemptions 5 and 6.

Under the FOIA, an agency may withhold exempt information only if it "reasonably foresees that disclosure would harm an interest protected by [a FOIA] exemption," "consider[s] whether partial disclosure of information is possible," and "take[s] reasonable steps necessary to segregate and release nonexempt

information." 5 U.S.C. § 552(a)(8)(A). "A record is not reasonably segregable if 'exempt and nonexempt information are inextricably intertwined, such that the excision of exempt information would impose significant costs on the agency and produce an edited document with little informational value.'" *Elec. Priv. Info. Ctr. v. FBI*, No. 1:17-cv-00121 (TNM), 2018 WL 2324084, at *6 (D.D.C. May 22, 2018). The SEC "enjoy[s] 'a presumption that [it] complied with the obligation to disclose reasonably segregable material.'" *Id.*

SEC staff reviewed the records responsive to the First Category to determine whether any portions of those records could be segregated for public disclosure. J.A. 46 at ¶19. SEC staff have provided all non-exempt information that could be segregated from exempt information. *Id*. As discussed *supra*, courts have recognized that "[i]f a document is fully protected as work product, then segregability is not required." *Jud. Watch*, 432 F.3d at 371.

NCLA repeats generally that the SEC's declarations and *Vaughn* Index do not explain the foreseeable harm that would occur if the withheld information were released. Br. at 26-31. Without any supporting evidence, NCLA claims that "disclosure could only have benefited [] the agency" and that the SEC must be withholding information only to avoid "[e]mbarrassment." *See* Br. at 28-29. But NCLA ignores that the declarations provided by Mark Tallarico provide sufficient

explanation about the harm that would arise if the SEC released the withheld information.[10]

An agency should "provide a 'focused and concrete demonstration of why disclosure of the particular type of material' will cause foreseeable harm 'in the specific context of the agency action at issue.'" *Energy Pol'y Advocs. v. U.S. Dep't of State*, No. 1:19-CV-03307 (TNM), 2023 WL 4198200, at *3 (D.D.C. June 27, 2023). "But even without enough explanation from the agency, the 'context and purpose' of withheld information can support a finding of foreseeable harm." *Id*.

The Tallarico Declaration is sufficient to establish foreseeable harm, as it states that disclosure of the information withheld under the attorney work-product doctrine "would deprive the SEC of its ability to withhold any information in future litigation, and consequently would deprive SEC attorneys of a zone of privacy within which to weigh facts and evidence and evaluate how to handle

[10] NCLA complains that the SEC does not address foreseeable harm in the *Vaughn* Index or the Katilius Declaration (Br. at 28 & n.17) but fails to show that the SEC is required to do so in any source in addition to the Tallarico Declarations. *See Clemente v. FBI*, No. 1:20-cv-1527 (TNM), 2022 WL 17092585, at *2 (D.D.C. Nov. 21, 2022) (agency may rely on *Vaughn* index, declarations, or both in support of summary judgment); *Keeping Gov't Beholden, Inc. v. U.S. Dep't of Justice*, No. CV 17-1569, 2021 WL 5918627, at *11 (D.D.C. Dec. 13, 2021) ("the *Vaughn* index must be considered in conjunction with [the agency's] supplemental declaration"), *aff'd sub nom*. *Brody v. U.S. Dep't of Justice*, No. 22-5043, 2023 WL 1511679 (D.C. Cir. Feb. 3, 2023).

future litigation." J.A. 45 at ¶14; *see Jud. Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 736 F. Supp. 2d 202, 209 (D.D.C. 2010) ("privilege aims to protect the adversary trial process by providing attorneys a 'zone of privacy within which to think, plan, weigh facts and evidence, candidly evaluate a client's case, and prepare legal theories'"). Courts find foreseeable harm in these circumstances. *See, e.g.*, *Clemente*, 2022 WL 17092585, at *6 (court found "reasonably foreseeable harm" in releasing memoranda created in anticipation of litigation because it "would impede prosecutors' ability to properly prepare legal theories and would hinder their ability to effectively represent the United States in any [related] future litigation").

Additionally, the SEC established foreseeable harm as the declaration explains the chilling effect of disclosing deliberations in the specific context at issue here. *See* J.A. 45 at ¶15 (disclosure "*would* chill ongoing discussions about addressing the control deficiency the SEC identified as well as discussions about addressing future issues the SEC may face" and "staff across the SEC would likely limit their discussions and inhibit their candor in discussing issues relating to the control deficiency and other issues that may arise in the future," which "*would* make it more difficult for SEC leadership to obtain the advice necessary to efficiently and effectively address complex issues about its operations and would hamper comprehensive reviews designed to address and improve those issues")

(emphasis added). The Tallarico Declaration further explains that "[p]ublic release of these discussions would also likely deter SEC staff's future willingness to share ideas, recommendations, and preliminary thoughts on issues and matters before them." *Id.*

Courts have found that similar declaration language adequately explained foreseeable harm. *See, e.g.*, *Machado*, 971 F.3d at 371 (agency "affidavit adequately explained that full disclosure of [records] would discourage line attorneys from 'candidly discuss[ing] their ideas, strategies, and recommendations,' thus impairing 'the forthright internal discussions necessary for efficient and proper adjudication of administrative appeals'"); *Lawyers' Comm. for C.R. v. U.S. Off. of Mgmt. & Budget*, No. CV 18-645 (EGS), 2023 WL 3433978, at *9-11 (D.D.C. May 12, 2023) (finding declaration sufficient that stated, among other things, "disclosure 'would prompt [office] staff to be less candid' or perhaps not meaningfully participate in the deliberative process, which in turn would 'seriously harm [office's] ability to function'" and also "would inhibit [office's] ability to have frank and open discussions on policy matters with other parts of the Executive Branch"); *Reliant*, 520 F. Supp. 2d at 204 (releasing documents related to factual investigation "would allow a reader to probe too deeply into the thought processes of the drafters and would have a chilling effect on communication between agency employees").

The Tallarico Declaration further notes the risk of public confusion should the withheld discussion concerning the draft Commission statement, as well as the draft itself, be released. J.A. 45 at ¶15 (release would "cause confusion to the public because these discussions and the draft statement contain deliberations about what the final statement should be and are not reflective of the publicly released statement"). Indeed, "the D.C. Circuit has 'long recognized that the risk of public confusion has a special force with respect to disclosures of agency positions or reasoning concerning proposed *policies*.'" *Energy Pol'y Advocs.*, 2023 WL 4198200, at *4 (emphasis in original) ("All of the redacted documents discuss subordinates' thoughts and analysis on proposed policies for decision-makers to review. Releasing such inchoate material could certainly mislead and foreseeably harm the agency's processes." (internal citation omitted)); *Lawyers' Comm.*, 2023 WL 3433978, at *10-11 (concluding that agency sufficiently explained "how release of the documents [at issue] . . . would cause [public confusion]" when declarant stated, inter alia, that "release of the draft documents . . . would cause public confusion because those documents contain arguments for and against certain text as well as changes, comments, and edits").

Finally, the Tallarico Declaration recognizes the potential harm in releasing the names of certain SEC staff involved in the internal review and the emails and phone numbers of SEC staff and contractors. *See* J.A 46 at ¶18 (disclosure would

"unnecessarily expos[e] personal information to the public"). Contrary to NCLA's claim that the SEC made "zero references to how the agency balanced any privacy interests against any public interest" (Br. at 28), the Supplemental Tallarico Declaration states that "SEC staff have considered the public's interest in disclosure against the privacy interests at stake" and "disclosed all portions of documents that it reasonably foresees could be disclosed without causing harm to the SEC's interests at stake." J.A. 191 at ¶8.

Through its declarations, the SEC showed the foreseeable harm that would arise should the withheld information be released, which NCLA fails to contravene.[11]

## II. The district court correctly found that the SEC conducted an adequate search for records responsive to the Second Category.

NCLA asserts that the SEC did not conduct an adequate search for records responsive to the Second Category. Br. at 31-37. While NCLA's arguments mention several issues, the essence of each point is that it disagrees with the SEC's determination that to the extent NCLA seeks records relating to closed administrative proceedings affected by the control deficiency, NCLA is improperly

[11] NCLA relies on *Reporters Comm. for Freedom of the Press v. FBI*, 3 F.4th 350 (D.C. Cir. 2021) (Br. at 27, 29-30), which is distinguishable from the circumstances here. *Id.* at 370-72 (foreseeability of harm standard not met in connection with, among others, records containing "purely factual material" and where declarations did not specify harm relating to each different kind of record).

asking the SEC to conduct further analysis to determine whether, and in which administrative proceedings, Enforcement staff accessed adjudication memoranda. *See id*. at 36.

A review of the relevant facts shows that the SEC's determination was proper. "In March, April, and May 2023, the SEC's counsel and [NCLA's] counsel discussed ways of narrowing [the remaining] sub-parts of [NCLA's] FOIA request," and "[t]he parties ultimately agreed that the SEC would process two categories of records," including the Second Category, or "the first page of the Order Instituting Proceedings . . . of every administrative proceeding in which the 'control deficiency' occurred." J.A. 42 at ¶5; *see also* Dkt. No. 14 at 2. The SEC initially informed NCLA that it was withholding all requested documents under Exemption 5. J.A. 46 at ¶21.[12] Then, on June 2, 2023, the SEC issued the Second Statement. J.A. 46-47 at ¶22. On June 13, 2023, the SEC's counsel emailed NCLA's counsel to inform them that the Second Statement allowed NCLA to access the OIPs that NCLA was seeking in its Second Category. J.A. 47 at ¶23. The SEC's counsel stated that, by citing and providing links to the OIPs and

---

[12] NCLA states that the "SEC at first claimed it had no responsive records" (Br. at 31), but the page it cites states that "the SEC initially informed Plaintiff that it was withholding all the requested documents under Exemption 5" (J.A. 46 at ¶21).

electronic dockets in the Second Statement and its accompanying exhibits, the SEC had provided all responsive records for the Second Category. *Id.*

NCLA's counsel then asked whether any closed, settled, or otherwise disposed-of matters were affected by the control deficiency. *Id.* The SEC's counsel stated that the SEC had provided responsive materials for every administrative proceeding in which the SEC had made a determination that one or more Adjudication memoranda were accessed by Enforcement staff. *Id.* The SEC's also counsel stated that to the extent that NCLA sought "the first page of the Order Instituting Proceedings" for administrative proceedings that were not discussed in the Second Statement, NCLA would be making an improper FOIA request because it would be asking the SEC to conduct further analysis to determine whether, and in which of those administrative proceedings, Enforcement staff accessed Adjudication memoranda. *Id.*

NCLA objects to this response and claims both that the SEC did not conduct an appropriate search and that to the extent the SEC could "simply query its own database," its request would not be improper. *See* Br. at 31-37. These objections are meritless. First, the SEC conducted a proper search to determine whether the information NCLA sought about closed matters was available. The SEC has explained that "OGC staff consulted with the SEC staff handling the internal review of the control deficiency, and they stated that neither they nor other SEC

officers or staff had determined that Adjudication memoranda were accessed by Division of Enforcement staff in administrative proceedings that were not discussed in the Second Statement, including closed administrative proceedings." J.A. 191 at ¶7. Consulting with staff knowledgeable about what work staff handling the internal review had done was a reasonable way to search for documents about the results of the internal review. *See, e.g.*, *Amiri*, 664 F. Supp. 3d at 11 (agency "must show that it conducted a search reasonably calculated to uncover all relevant documents" in "surrounding circumstances"); *Machado Amadis v. U.S. Dep't of Justice*, 388 F. Supp. 3d 1, 14 (D.D.C. 2019) (agency "'has discretion to craft its search to meet [the] standard'"), *aff'd*, 971 F.3d 364 (D.C. Cir. 2020); *Elec. Priv. Info. Ctr.*, 2018 WL 2324084, at *2 ("Searching for records requires 'both systemic and case-specific exercises of discretion and administrative judgment and expertise,' and is 'hardly an area in which the courts should attempt to micromanage the executive branch.'").

Second, NCLA provides no basis for its view that the SEC could "simply query" some database to determine whether any closed matters were impacted. Br. at 36. The Tallarico Declaration states that "further analysis" was necessary to make the determination (J.A. 47 at ¶23), and both the April 5, 2022 Statement and the Second Statement support a finding that a determination of the impact of the control deficiency is not simple as they detail the extensive efforts made to make

determinations about the administrative proceedings addressed in those documents. *See* April 5, 2022 Statement (BRG's "analysis includes a detailed review of the Office of the Secretary databases in which the Adjudication memoranda were stored and the Enforcement databases into which some of those memoranda were uploaded. BRG is also conducting an analysis of access logs for the various systems."); Second Statement ("The review team has interviewed more than 250 current and former staff members . . . The review team has collected and considered documents from Enforcement, OS, and OGC, including over 500,000 pages of emails and attachments. The team has also reviewed hundreds of case files in Enforcement's case management database . . . Working with Berkeley Research Group, the review team has analyzed over 25 million rows of data from access logs for various systems."). A request that the SEC undertake the type of analysis described in these statements is plainly an improper FOIA request because the FOIA does not require agencies to "undertake research, analysis, and formulation of opinions." *Hall & Assocs. v. U.S. EPA*, No. 16-5315, 2018 WL 1896493, at *2 (D.C. Cir. Apr. 9, 2018). Agencies do not have an obligation to create records to respond to FOIA requests. *See Jarvis v. Comm'r, Soc. Sec. Admin.*, No. 18-5170, 2018 WL 6722401, at *1 (D.C. Cir. Dec. 18, 2018) ("no duty to create statistical records in response to appellant's FOIA request"); *Skinner v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 12-5319, 2013 WL

3367431, at *1 (D.C. Cir. May 31, 2013) ("FOIA does not require federal agencies to create or obtain records").

To the extent NCLA is also complaining that the SEC provided information about the open administrative proceedings by providing the Second Statement instead of the first pages of the OIPs that the Second Statement referred to, NCLA has not shown any harm. *See* Br. at 35. As the SEC has previously stated, the SEC provided NCLA with a link to the Second Statement to access responsive documents because the SEC believed that response to be the most straightforward and efficient way of providing the first pages of the OIPs. The SEC has long stated that, should NCLA request that the SEC provide those records in a different format, the SEC will do so. *See* J.A. 187.

## CONCLUSION

For the foregoing reasons, the order of the district court granting the SEC's motion for summary judgment should be affirmed.

Respectfully submitted,

J. RUSSELL MCGRANAHAN
General Counsel

ELIZABETH MCFADDEN
Deputy General Counsel

MELINDA HARDY
Assistant General Counsel

/s/ *Alexandra Verdi*
ALEXANDRA VERDI
Attorney

U.S. Securities and Exchange Commission
Boston Regional Office
33 Arch Street, Floor 24
Boston, Massachusetts 02110
(202) 551-5057 (Verdi)
verdim@sec.gov

April 17, 2026

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 12,668 words, excluding the parts of the brief exempted by Fed. R. App. 32(f).

I also certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface—Times New Roman, at least 14 point—using Microsoft Word.

Dated: April 17, 2026

*/s/ Alexandra Verdi*
Alexandra Verdi

## CERTIFICATE OF SERVICE

I, Alexandra Verdi, hereby certify that, on April 17, 2026, I caused to be served by CM/ECF the Brief of the U.S. Securities and Exchange Commission, Appellee, in *New Civil Liberties Alliance v. SEC*, No. 25-5383, on all CM/ECF participants.

*/s/ Alexandra Verdi*
Alexandra Verdi