**NOT YET SCHEDULED FOR ORAL ARGUMENT**

# United States Court of Appeals for the District of Columbia Circuit

**No. 25-5383**

NEW CIVIL LIBERTIES ALLIANCE,

*Plaintiff-Appellant,*

*v.*

SECURITIES AND EXCHANGE COMMISSION,

*Defendant-Appellee.*

*On Appeal from the United States District Court for the District of Columbia in No. 1:22-cv-03567-CJN, Honorable Carl J. Nichols, U.S. District Judge.*

# REPLY BRIEF FOR PLAINTIFF-APPELLANT


NATHANIEL LINDZEN
THE LAW OFFICE OF
NATHANIEL M. LINDZEN
57 School Street
Wayland, Massachusetts 01778
(212) 810-7627
nlindzen@corpfraudlaw.com

MATTHEW HARDIN
HARDIN LAW OFFICE
101 Rainbow Drive #11506
Livingston, Texas 77399
(202) 802-1948
matthewdhardin@gmail.com

*Counsel for Plaintiff-Appellant*


May 28, 2026


COUNSEL PRESS
A Proceed Service
The Appellate Experts®
(800) 4-APPEAL • (392512)

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

CHRONOLOGY OF SEC DISCLOSURE DURING THIS APPEAL ........ 2

SUMMARY OF THE ARGUMENT ........ 3

ARGUMENT ........ 4

I. THE SEC'S VAUGHN INDEX AND DECLARATIONS REMAIN FACIALLY DEFICIENT. ........ 4

A. The SEC Concedes That Its Vaughn Index Does Not Separately Address 2,422 Pages of Withheld Records ........ 4

B. The Page-Count Discrepancy Is Material, Not a "Molehill." ........ 6

C. SEC's Boilerplate Descriptions Remain Categorically Inadequate. ........ 8

II. THE SEC HAS NOT CARRIED ITS BURDEN UNDER EXEMPTION 5. ........ 10

A. Work Product Cannot Shield Purely Factual Forensic Data. ........ 10

B. The Withheld Documents Are Multipurpose, and the SEC Has Not Carried Its Heavier Burden. ........ 12

C. The Government Misconduct Exception Was Not Forfeited and Applies Here. ........ 15

D. The Consultant Corollary Should Not Protect Documents Generated in Circumvention of the Inspector General Act. ........ 17

III. **The SEC Has Not Carried Its Burden Under Exemption 6.** ........ 20

IV. **The SEC's "Foreseeable Harm" Showing Is Coextensive with Exemption 5 Itself and Therefore a Nullity.** ........ 24

V. **The SEC Failed to Conduct a Reasonable Search for the Second Category of Records.** ........ 28

VI. **Arguments the SEC Failed to Address or Effectively Conceded** ........ 31

**CONCLUSION** ........ 33

**CERTIFICATE OF COMPLIANCE** ........ 35

**CERTIFICATE OF SERVICE** ........ 36

## TABLE OF AUTHORITIES

### Cases

*Am. C.L. Union v. U.S. Dep't of Def.*,
628 F.3d 612 (D.C. Cir. 2011) .......... 5

*Brown v. FBI*,
143 F.4th 481 (D.C. Cir. 2025) .......... 6, 15

*Campbell v. United States Dep't of Just.*,
164 F.3d 20 (D.C. Cir. 1998) .......... 6

*Carter v. U.S. Dep't of Com.*,
830 F.2d 388 (D.C. Cir. 1987) .......... 7

*Coastal States Gas Corp. v. Dep't of Energy*,
617 F.2d 854 (D.C. Cir. 1980) .......... 9

*Ctr. for Investigative Reporting v. U.S. Dep't of Justice*,
14 F.4th 916 (9th Cir. 2021) .......... 29

*Ctr. for Pub. Integrity v. U.S. Dep't of Def.*,
486 F. Supp. 3d 317 (D.D.C. 2020) .......... 16

*Dep't of Interior v. Klamath Water Users Protective Ass'n*,
532 U.S. 1 (2001) .......... 18, 19, 20

*EEOC v. Lutheran Soc. Servs.*,
186 F.3d 959 (D.C. Cir. 1999) .......... 13

*Energy Pol'y Advocs. v. SEC*,
No. 23-507, 2024 WL 4512386 (D.D.C. Oct. 17, 2024) .......... 8

*Hickman v. Taylor*,
329 U.S. 495 (1947) .......... 11

*Hum. Rts. Def. Ctr. v. United States Park Police*,
126 F.4th 708 (D.C. Cir. 2025) .......... 21, 22

*In re Sealed Case*,
146 F.3d 881 (D.C. Cir. 1998) .......... 16

*Jud. Watch, Inc. v. U.S. Dep't of Just.*,
432 F.3d 366 (D.C. Cir. 2005) .......... 10

*McGehee v. CIA*,
697 F.2d 1095 (D.C. Cir. 1983) ........................................................ 30

*Nat'l Whistleblower Ctr. v. Dep't of Health & Hum. Servs.*,
903 F. Supp. 2d 59 (D.D.C. 2012) ..................................................... 15

*Power the Future v. U.S. Dep't of State*,
No. 24-346, 2025 WL 343175 (D.D.C. Jan. 30, 2025) ......................... 21

*Public Citizen v. Dep't of State*,
276 F.3d 634 (D.C. Cir. 2002) .......................................................... 30

*Reporters Comm. for Freedom of the Press v. FBI*,
3 F.4th 350 (D.C. Cir. 2021) ............................................................ 26

*Rudometkin v. United States*,
140 F.4th 480 (D.C. Cir. 2025) .................................................... 11-12

*Shapiro v. U.S. Dep't of Just.*,
969 F. Supp. 2d 18 (D.D.C. 2013) ..................................................... 10

*Stern v. FBI*,
737 F.2d 84 (D.C. Cir. 1984) ................................................ 22, 23, 24

*Sussman v. U.S. Marshals Service*,
494 F.3d 1106 (D.C. Cir. 2007) ........................................................ 12

*U.S. Dep't of State v. Ray*,
502 U.S. 164 (1991) ............................................................................ 5

*United States v. ISS Marine Servs., Inc.*,
905 F. Supp. 2d 121 (D.D.C. 2012) ................................................... 14

*Vaughn v. Rosen*,
484 F.2d 820 (D.C. Cir. 1973) ............................................................ 5

*West Virginia v. EPA*,
597 U.S. 697 (2022) .......................................................................... 20

**Statutes**

5 U.S.C. § 401 *et seq* ....................................................................... 19

5 U.S.C. § 552(a)(8)(A)(i)(I) ............................................................... 27

5 U.S.C. § 552(b)(5) .......................................................................... 20

## GLOSSARY

| | |
|---|---|
| **BRG** | Berkeley Research Group, LLC |
| **FOIA** | Freedom of Information Act |
| **J.A.** | Joint Appendix |
| **NCLA** | New Civil Liberties Alliance |
| **OGC** | Office of the General Counsel |
| **OIG** | Office of Inspector General |
| **OIP** | Order Instituting Proceedings |
| **OIT** | Office of Information Technology |
| **Resp. Br.** | Brief of the U.S. Securities and Exchange Commission, Appellee |
| **Opening Br.** | Brief for Plaintiff-Appellant |
| **SEC** | U.S. Securities and Exchange Commission |

## INTRODUCTION

The SEC's Response Brief ("Resp. Br.") asks this Court to accept that an agency may withhold thousands of pages by filing self-contradictory declarations, a Vaughn Index covering only a fraction of the withheld records, and conclusory privilege assertions that would apply equally to any document the agency has ever generated. This Court should decline that invitation.

Three features of the SEC's Response are telling. First, the SEC concedes that its Vaughn Index does not separately describe 2,422 pages of fully withheld attachments but claims the Index's entries for 55 pages of parent emails somehow "include" those attachments. Resp. Br. 14-16. Second, the SEC does not dispute giving two different page counts for the withheld records (1,835 then 2,422)[1] but dismisses this serial inaccuracy as a "molehill."[2] Resp. Br. 15. Third, the SEC claims for the first time on appeal that the Inspector General did investigate the control deficiency

[1] The District Court's figure was different from both of SEC's proffers: 1,855. J.A. 196. All parties agree that the District Court was in error on that point. Resp. Br. 16, n.2.

[2] This despite that both parties apparently agree on appeal that the figure the District Court relied upon was incorrect.

(Resp. Br. 23 n.7), contradicting its posture below, where no such fact was ever disclosed. These features confirm NCLA's central contention: the SEC has not met its burden of proof on any issue.

It is also worth noting what the SEC's Response Brief does not do. It does not defend the district court's figure of 1,855 withheld documents and implicitly acknowledges that the district court was in error as to the volume of records at issue. Nor does SEC explain why no supplemental Vaughn Index was filed when 587 additional pages were discovered. It does not overcome the multipurpose nature of the withheld documents. And it does not meaningfully differentiate its foreseeable harm language from the generic rationale for Exemption 5 itself.

## CHRONOLOGY OF SEC DISCLOSURE DURING THIS APPEAL

NCLA filed a FOIA request with the SEC for all documents related to the control deficiency on July 12, 2022. SEC disclosed the existence of the BRG investigation and report but identified no other reports on the issue—indeed on July 19, 2022 in sworn testimony before Congress, SEC Enforcement Director Gubir Grewal claimed he had no information on whether the SEC Inspector General was investigating. Receiving no BRG report or any other relevant information in protracted FOIA disputes,

NCLA filed this suit in district court on November 23, 2022. Judge Nichols granted summary judgment to the SEC on August 29, 2025. NCLA appealed that decision, and its opening brief was filed on February 17, 2026. On February 19, 2026, SEC revealed for the first time (in other litigation) the existence of an Inspector General report which showed the Inspector General's investigation began on June 13, 2022 and was completed on May 4, 2023. In this case, SEC first mentioned that report on appeal.

## SUMMARY OF THE ARGUMENT

The SEC's response to NCLA's FOIA request is deficient in every respect. The SEC's Vaughn Index was amended below, but neither the SEC's initial index nor its revised index support the district court's finding as to the number of documents being withheld. Exemption 5 cannot shield purely factual forensic data SEC's vendor BRG compiled from access logs, and the SEC has not met its heavier burden for dual-purpose documents serving both litigation and operational functions. The government misconduct exception applies because the withheld records concern the SEC's own admitted malfeasance. The SEC's Exemption 6 privacy assertions are unsupported by any documented threat, and the

public interest in identifying government actors responsible for systemic misconduct outweighs speculative privacy concerns. The SEC's foreseeable harm showing merely restates the exemptions' rationale without identifying particularized harm. Finally, the SEC's refusal to search for records on closed proceedings affected by the control deficiency is an admission that it chose not to look.

## ARGUMENT

### I. THE SEC'S VAUGHN INDEX AND DECLARATIONS REMAIN FACIALLY DEFICIENT.

#### A. The SEC Concedes That Its Vaughn Index Does Not Separately Address 2,422 Pages of Withheld Records.

The SEC's Response Brief effectively concedes the central deficiency NCLA identified: the Vaughn Index does not separately describe the 2,422 pages of attachments that were withheld in full. The SEC admits that "the Vaughn Index does not specify the number of pages of attachments." Resp. Br. 15. The SEC's defense is that each parent email entry in the Index "explains what the attachments are, the applicable exemptions, and the bases for withholding the attachments." Resp. Br. 14. But this is precisely the kind of categorical, blanket

treatment that *Vaughn v. Rosen*, 484 F.2d 820, 826-28 (D.C. Cir. 1973), was designed to prevent.

Consider the SEC's claim. An entry stating "in attachments to an email forensic data generated by BRG staff concerning the control deficiency is withheld" (J.A. 51) is, according to the SEC, a sufficient description of potentially hundreds of pages of attachments. The SEC provides no information about the nature or content of these attachments beyond "forensic data," does not describe which databases were searched or what data was compiled, and does not disclose how many attachments are associated with each email entry. This is not a Vaughn Index; it is a blanket assertion of privilege over an undifferentiated mass of records. *U.S. Department of State v. Ray*, 502 U.S. 164, 173 (1991).

The SEC's citation to *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011), for the proposition that its justification need only appear "logical or plausible" does not rescue its position. That standard applies to the *substance* of the claimed exemption, not to the threshold question of whether the agency has provided enough information for a court to evaluate the claim in the first place. An agency that refuses to describe the documents it is withholding has not made any showing at all, "logical"

or otherwise. *Campbell v. United States Dep't of Just.*, 164 F.3d 20, 31 (D.C. Cir. 1998) (court cannot rule on the basis of "facially inadequate" declarations).

The SEC also argues that NCLA's complaints about the Vaughn Index were "raise[d] … for the first time on appeal." Resp. Br. 14. Not so. NCLA's Opposition below expressly argued that the Vaughn Index was deficient and that the declarations were contradictory, noting that the SEC's "broad and repetitive reasons for withholding, through redactions and with numerous documents withheld in full, and without giving enough detail about the content to understand meaningfully why the documents were withheld, are facially inadequate." J.A. 130. Regardless, this Court reviews FOIA cases *de novo* and may consider any grounds in the record. *Brown v. FBI*, 143 F.4th 481, 488 n.5 (D.C. Cir. 2025).

### B. The Page-Count Discrepancy Is Material, Not a "Molehill."

The SEC dismisses its serial misstatements about the number of withheld pages as NCLA "mak[ing] a mountain out of a molehill." Resp. Br. 15. SEC's casual treatment of discrepancies in sworn declarations (and the district court's apparent crediting of a declaration even SEC

admits was erroneous) is remarkable. The discrepancy is material for three reasons.

First, the discrepancy undermines the reliability of the SEC's evidentiary submission. The SEC submitted declarations under penalty of perjury stating that 1,835 pages were withheld. J.A. 78. That figure was wrong. The agency revised it to 2,422 pages, having "inadvertently omitted one attachment," an Excel spreadsheet of 587 pages. J.A. 192. The district court cited a third figure, 1,855, appearing in none of the SEC's submissions. J.A. 196. The SEC does not explain this third figure. When "information contained in agency affidavits is contradicted by other evidence in the record," the declaration's reliability is called into question. *Carter v. U.S. Department of Commerce*, 830 F.2d 388, 393 (D.C. Cir. 1987). An agency that cannot accurately count its withheld pages cannot credibly claim the careful review FOIA requires.

Second, the discrepancy in SEC's accounting of how many documents it withheld is material because it undermined the district court's analysis. The district court found that "the Commission withheld 1,855 documents," (J.A. 196), a figure that is wrong by any measure: the SEC's own corrected figure is 2,422 pages. The district court was

operating from an incorrect factual premise when evaluating the adequacy of the SEC's Vaughn Index and declarations. A court that does not know how many documents are at issue cannot evaluate whether those documents have been adequately described or whether privilege claims have been substantiated.

Third, the discrepancy affected NCLA's ability to challenge the withholdings. NCLA was not told until the SEC's reply brief below that 587 additional pages existed, and no party argues in this Court or below that the figure in the summary judgment opinion below is correct. NCLA had no opportunity to respond to the revised accounting or argue that the Vaughn Index was inadequate as to those pages. The SEC cannot surprise its adversary with a revised page count on reply and then dismiss the confusion as a "molehill."

### C. The SEC's Boilerplate Descriptions Remain Categorically Inadequate.

The SEC defends its use of repetitive, identical descriptions in the Vaughn Index by citing *Energy Policy Advocates v. SEC*, No. 23-507, 2024 WL 4512386, at *6 (D.D.C. Oct. 17, 2024), for the proposition that "repetitive language is expected if the withheld records relate to the same subject matter." Resp. Br. 18. But the problem is not similar language; it

is identical boilerplate applied to different records, providing no way for a reviewing court to determine whether the privilege applies to any particular document. The SEC's Vaughn Index uses the same "Basis for Withholding" for an email about "SharePoint Queries" (J.A. 63), for "Hashes for Andrew" (J.A. 58), for "BRG Teams File Requests" (J.A. 67), and for a draft Commission statement (J.A. 62). These involve different documents serving different functions, yet the SEC's justification is identical throughout.

The SEC's Index does not describe the specific deliberative process involved in each communication, the function and significance of each document, or the decision-making authority of each document's author and recipient. *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). The SEC argues that identifying individuals only as "Staff" is adequate because the Chairman and Commissioners were "not parties to the emails." Resp. Br. 33-34. Even so, the SEC has not identified who was a party to each communication, what role they played in the deliberative process, or why each specific communication is privileged. That is not a Vaughn Index; it is a conclusory assertion that all internal emails about a sensitive topic are exempt.

## II. The SEC Has Not Carried Its Burden Under Exemption 5.

### A. Work Product Cannot Shield Purely Factual Forensic Data.

The SEC's defense of its Exemption 5 withholdings rests on the assertion that *all* withheld material is protected by the attorney work-product doctrine. Even the SEC's own cases, however, recognize that work-product privileges are "to be narrowly interpreted." *Shapiro v. U.S. Dep't of Justice*, 969 F. Supp. 2d 18, 27 (D.D.C. 2013) (citation omitted). The SEC contends that the work-product doctrine "does not distinguish between factual and deliberative material," Resp. Br. 28, but that proposition, drawn from *Shapiro*, addresses only whether factual material *appearing within documents that are attorney work product* may be withheld. *Jud. Watch, Inc. v. U.S. Dep't of Justice*, 432 F.3d 366, 371 (D.C. Cir. 2005). It does not stand for the proposition that raw forensic data generated by an outside consultant is cloaked with work-product protection simply because it was compiled at a lawyer's direction.

The SEC's descriptions reveal that many withheld attachments consist of forensic data compiled by BRG. The Tallarico Declaration states that "[m]any of the emails have attachments with forensic data generated by BRG for use in the internal review." J.A. 43 at ¶ 7. The

Vaughn Index repeats this characterization for attachment after attachment: ”forensic data generated by BRG staff concerning the control deficiency is withheld.“ J.A. 51, 53-55, 57-61, 63, 65-66. The subject lines confirm their factual character: ”Hashes for Andrew“ (J.A. 58), ”All searches v2“ (J.A. 60), ”RE: SharePoint Queries“ (J.A. 63), ”RE: Memos for Search“ (J.A. 66). These are forensic-data transmittals, not legal memoranda. Pure data compilations from access logs and database queries are not “mental processes” of the attorney.” *Hickman v. Taylor*, 329 U.S. 495, 514 (1947). They are raw material that should be segregated and released.

The SEC asserts that this Court need not conduct a segregability analysis because “[i]f a document is fully protected as work product, then segregability is not required.” Resp. Br. 27. But the question at issue is whether the documents are *fully* protected. The SEC cannot credibly claim that its forensic data attachments are fully protected work product while conceding that they consist of raw forensic data. At a minimum, the district court was required to determine whether factual data could be segregated from any protected opinion work product. *Rudometkin v.*

*United States*, 140 F.4th 480, 495 (D.C. Cir. 2025) (court must conduct segregability analysis *sua sponte*).

The SEC's segregability showing is deficient. The Tallarico Declaration states that "SEC staff reviewed the records responsive to the First Category to determine whether any portions could be segregated" and that "SEC staff have provided all non-exempt information that could be segregated from exempt information." J.A. 46 at ¶ 19. This is the type of conclusory assertion this Circuit has found insufficient. An agency must explain why factual material cannot be separated from protected material. The SEC does not identify a single document where segregation was considered and rejected, nor explain what makes forensic data inseparable from opinion work product. Where the SEC's own descriptions characterize entire attachments as "forensic data" (J.A. 51, 53-55, 57-61, 63, 65-66), the agency must explain why that data cannot be extracted. *Sussman v. U.S. Marshals Service*, 494 F.3d 1106, 1116 (D.C. Cir. 2007).

### B. The Withheld Documents Are Multipurpose, and the SEC Has Not Carried Its Heavier Burden.

The SEC asserts that NCLA "provides no reason to treat the documents at issue as 'multi-purpose documents.'" Resp. Br. 27. The

record says otherwise. The SEC's own declarations establish that the internal review served two distinct purposes: (1) preparing for foreseeable litigation, and (2) making operational decisions about affected proceedings. The Tallarico Declaration states that "confidential discussions and the data generated from the discussions formed the basis for advice conveyed to SEC officials who needed to decide what actions to take." J.A. 45 at ¶ 15. The Commission Statements confirm the operational purpose: BRG conducted "a comprehensive review of the facts surrounding the control deficiency and assessing its potential impact on administrative adjudicatory matters," culminating in the dismissal of 42 open proceedings.

These are classic dual-purpose documents: records prepared both because litigation was foreseeable and because the agency needed operational decisions about its pending caseload. The SEC all but concedes this by citing *EEOC v. Lutheran Social Services*, 186 F.3d 959, 968-69 (D.C. Cir. 1999), acknowledging that the review might have been conducted "both because of the prospect of litigation and to address matters arising in the ordinary course of business." Resp. Br. 28. When documents serve dual purposes, the privilege's proponent bears a

"heavier burden." *United States v. ISS Marine Services, Inc.*, 905 F. Supp. 2d 121, 134 (D.D.C. 2012). The SEC has not carried that burden. Its Vaughn Index applies the same boilerplate work-product assertion to every document without differentiating between those prepared for litigation and those prepared for operational decision-making.

The Vaughn Index itself makes the dual-purpose nature unmistakable. The Index describes emails that "address the review of the handling and processing" of specific proceedings, naming two by caption: *Cochran* (Admin. Proc. 3-17228) and *Jarkesy* (Admin. Proc. 3-15264) (J.A. 50). Reviewing "the handling and processing" of pending cases is an operational function; it is what an agency does when deciding whether to dismiss affected proceedings. The Index further describes attachments containing "forensic data" used "to assess the scope and potential impact of the SEC's control deficiency" (J.A. 51, 53-55, 57-61, 63, 65-66), feeding directly into the Commission's decision to dismiss 42 proceedings. And it describes a withheld "draft of a Commission statement" (J.A. 62), the final version of which announced an operational policy decision. The SEC's Index does not identify which purpose any entry primarily served.

### C. The Government Misconduct Exception Was Not Forfeited and Applies Here.

The SEC argues that NCLA "forfeit[ed]" its argument regarding the government-misconduct exception to the deliberative process privilege by not raising it below. Resp. Br. 35. That is incorrect. NCLA's Opposition below cited *Nat'l Whistleblower Ctr. v. Dep't of Health & Hum. Servs.*, 903 F. Supp. 2d 59, 66 (D.D.C. 2012), and argued at length that the SEC's privilege claims were undermined by the fact that the underlying records concerned government misconduct. J.A. 131-135. And again, this Court reviews FOIA cases *de novo* and may address any issue presented in the record. *Brown*, 143 F.4th at 488 n.5.

On the merits, the SEC asserts that NCLA "has provided no evidence that the withheld information … reflects any government wrongdoing." Resp. Br. 35. This is a jaw-dropping claim. The entire reason these records exist is that SEC enforcement staff improperly accessed the confidential work product of the very administrative law judges adjudicating their cases. The SEC concedes this fundamental fact. That is government wrongdoing on its face. The SEC's attempt to redefine the misconduct exception as applying only to wrongdoing reflected in the content of the deliberations themselves, rather than

wrongdoing that is the subject of the deliberations, finds no support in the case law. *In re Sealed Case*, 121 F.3d 729, 738 (D.C. Cir. 1997) ("where there is reason to believe the documents sought may shed light on government misconduct, the privilege is routinely denied").

The SEC cites *Center for Public Integrity v. U.S. Department of Defense*, 486 F. Supp. 3d 317, 331-32 (D.D.C. 2020), for its narrow reading of the exception. But that decision acknowledged that "it is not clear in this circuit whether a government misconduct exception may properly be invoked in a FOIA case." *Id.* at 331. That court addressed misconduct in the decision-making process itself, not whether an agency may invoke the deliberative process privilege to shield its response to its own admitted malfeasance. *In re Sealed Case* provides the answer: "where there is reason to believe the documents sought may shed light on government misconduct, the privilege is routinely denied, on the grounds that shielding internal government deliberations in this context does not serve the public's interest in honest, effective government." 121 F.3d at 738 (citation omitted).

### D. The Consultant Corollary Should Not Protect Documents Generated in Circumvention of the Inspector General Act.

The SEC's defense of the consultant corollary is undermined by a remarkable new factual assertion in its Response Brief. For the first time in this litigation, the SEC claims that the Inspector General *did* investigate the control deficiency, citing the OIG's Semi-Annual Report to Congress for April 1, 2023, through September 30, 2023. Resp. Br. 23 n.7. The SEC states that the OIG "did not find intentional misconduct." *Id*. But that information came only in another case after this case was *on appeal, after NCLA's opening brief* following years of litigation. It was never disclosed in the District Court. That alone requires reversal.

If the Inspector General did investigate, why did the SEC never disclose this in its declarations below? Why did SEC Enforcement Director Gurbir Grewal tell Congress he could not say whether the Inspector General was investigating, stating: "You would have to ask the Inspector General"? J.A. 107. And why did the SEC retain BRG and General Dynamics for a separate "internal review" if the Inspector General was already investigating, given BRG's existing multi-million-dollar contracts with SEC Enforcement? J.A. 107. The beyond-belated OIG disclosure, combined with the assertion that the OIG found no

intentional misconduct, reinforces the inference that the SEC conducted its review through favored contractors to maintain control over the narrative, free of Inspector General oversight and public reporting requirements.

The mere fact that the Inspector General investigated misconduct is not dispositive. Neither NCLA nor the district court had the benefit of disclosure of the OIG report below. And it certainly does not give SEC cover to call the "investigation" performed by private contractors the work of a consultant or to protect that information under the consultant corollary to FOIA's Exemption 5. NCLA does not dispute that this Court has applied the consultant corollary in appropriate cases. But the legal foundation for the corollary is narrow, and it does not reach the facts presented here, for three reasons.[3]

First, the corollary assumes that a consultant "functions just as an employee would be expected to do" and has no independent interest in the subject matter. *Department of Interior v. Klamath Water Users Protective Association*, 532 U.S. 1, 10-11 (2001). BRG and General

[3] NCLA has consistently preserved its argument that the consultant corollary is atextual and that cases purporting to recognize this non-statutory FOIA exemption should be overruled.

Dynamics are not disinterested advisors. The Tallarico Declaration asserts that BRG "has no interest related to the SEC's control deficiency other than providing assistance pursuant to its contract with the SEC," J.A. 44 at ¶ 11, and uses identical language for General Dynamics, J.A. 44 at ¶ 12. But the contract is the interest. BRG provides expert witness services to the SEC under contracts totaling millions of dollars. J.A. 107. A contractor whose future revenue depends on the agency's satisfaction has an obvious interest in producing results the agency wants, rather than results that might trigger Inspector General action. *Klamath*, 532 U.S. at 10-11.

Second, an agency employee who discovered internal misconduct would be expected, at minimum, to cooperate with the Inspector General and to facilitate the Inspector General's independent investigation, which produces a public report. 5 U.S.C. § 401 *et seq*. The SEC's contractors did not do so. They conducted a parallel investigation under the agency's direct control. That is not how an employee "would be expected" to behave; it is how a contractor retained to help the agency manage a scandal would behave. The corollary should not extend to

protect documents generated through the deliberate circumvention of the statutory framework for investigating government misconduct.

In any event, the Supreme Court has never endorsed the consultant corollary as a correct interpretation of Exemption 5. In *Klamath*, the Court assumed *arguendo* that communications with nongovernmental consultants could qualify as "intra-agency" memoranda but ruled against the government without deciding the question. 532 U.S. at 9-14. And as recently as 2022, the Court reaffirmed that it will not "stray[] from its commitment to textualism." *West Virginia v. EPA*, 597 U.S. 697, 751 (2022) (Gorsuch, J., concurring). The text of Exemption 5 protects only ”inter-agency or intra-agency memorandums or letters.“ 5 U.S.C. § 552(b)(5). Communications with nongovernmental parties are neither. This Court should decline to extend the corollary to shield documents created through a process designed to circumvent the Inspector General Act.

## III. THE SEC HAS NOT CARRIED ITS BURDEN UNDER EXEMPTION 6.

The SEC's Exemption 6 defense rests on two assertions: that the individuals whose names were redacted face a risk of "harassment,"

Resp. Br. 37-38, and that NCLA has not identified a countervailing public interest, Resp. Br. 39-40. Both assertions are incorrect.

As to the privacy interest, this Court's recent decision in *Human Rights Defense Center v. United States Park Police*, 126 F.4th 708 (D.C. Cir. 2025), is squarely on point. There, this Court rejected as insufficient an agency's "wholly conclusory" privacy assertions that "lack[ed] even minimal substantiation of the officers' privacy interest or the potential harm from disclosing their names." *Id.* at 715. The SEC's assertions here are no more concrete. The Tallarico Declaration states only that release of names "would unnecessarily expos[e] personal information" and "could lead to harassment by people who believe the internal review could have been handled differently." J.A. 46 at ¶ 18. No actual threats are documented. No instances of harassment of similarly situated individuals are cited. No particularized facts suggest that release of these names would cause harm "more palpable than mere possibilities." *Id.* at 716.

The SEC attempts to distinguish *Human Rights Defense Center* by citing *Power the Future v. U.S. Dep't of State*, No. 24-346, 2025 WL 343175, at *8 n.4 (D.D.C. Jan. 30, 2025). But *Power the Future* merely

observed that *Human Rights Defense Center* did not categorically bar all Exemption 6 withholdings of employee names. Of course it did not. NCLA's argument is not that employee names can never be withheld; it is that the SEC, like the Park Police, has failed to substantiate its privacy claims with anything beyond speculation.

The SEC also misrepresents the nature of the withheld names. It claims that "[t]he SEC did not withhold the names of the SEC staff and contractors who conducted the internal review." Resp. Br. 40. But the SEC did withhold the names of individuals who "had access to the databases at issue" and who "were interviewed by the internal review team." J.A. 46 at ¶ 17. These are the very individuals whose conduct gave rise to the control deficiency and whose potential misconduct the public has a right to evaluate. *Stern*, 737 F.2d at 92, recognized precisely this interest: the "public interest in the disclosure of the identities of . . . censured employees involved in the governmental wrongdoing, in order to hold the governors accountable to the governed." That principle applies regardless of whether the wrongdoers are senior officials or mid-level staff.

As to email addresses and phone numbers, the SEC cites cases involving private citizens' contact information, but the individuals at issue here are government employees and government contractors whom the SEC itself treats as the functional equivalent of employees for consultant-corollary purposes. Government employees generally have a diminished privacy interest in their work contact information. *Stern,* 737 F.2d at 91-92; *see also* Opening Br. 39-40. The SEC cannot have it both ways: it cannot claim that its contractors are functionally government employees for purposes of Exemption 5 yet simultaneously claim they enjoy the privacy protections of private citizens under Exemption 6.

The public interest in disclosure is substantial. The control deficiency involved SEC enforcement staff improperly accessing the confidential deliberations of the administrative law judges deciding their cases. This misconduct persisted for at least four years and ultimately forced the SEC to dismiss 42 open administrative proceedings.

The SEC claims it has never determined whether any closed or settled cases were similarly affected. Knowing which government actors were involved is essential to evaluating whether the SEC has taken adequate corrective measures. This is not a case involving low-level

employees whose identities shed no light on government operations. It involves individuals at the center of what the SEC acknowledges was a serious institutional failure, one that Congress has scrutinized (J.A. 106) and that continues to shape SEC reform proposals. The "public interest in the disclosure of the identities of . . . censured employees" in such circumstances is at its zenith. *Stern*, 737 F.2d at 92.

## IV. THE SEC'S "FORESEEABLE HARM" SHOWING IS COEXTENSIVE WITH EXEMPTION 5 ITSELF AND THEREFORE A NULLITY.

The SEC's foreseeable harm argument proves NCLA's point. The Tallarico Declaration offers precisely three statements regarding foreseeable harm, and each one merely restates the general rationale for the underlying exemption rather than identifying any particularized harm from disclosure of the specific records at issue.

First, as to the work-product doctrine, the declaration states that disclosure "would deprive the SEC of its ability to withhold any information in future litigation and consequently would deprive SEC attorneys of a zone of privacy within which to weigh facts and evidence and evaluate how to handle future litigation." J.A. 45 at ¶ 14. But this assertion is not tied to any specific characteristic of the records at issue. It would apply with equal force to every document any agency has ever

prepared in anticipation of litigation. The foreseeable harm requirement is a meaningless tautology if the agency can satisfy it by asserting, in effect, "releasing work product would undermine work-product protection."

Second, as to the deliberative process privilege, the declaration states that disclosure "would chill ongoing discussions about addressing the control deficiency the SEC identified as well as discussions about addressing future issues the SEC may face." J.A. 45 at ¶ 15. Once again, this assertion has no connection to the specific records at issue. Every document withheld under the deliberative process privilege could be described as potentially chilling "ongoing discussions" about some topic. If this concern satisfies the foreseeable harm standard, no document ever withheld under Exemption 5 could fail the test.

Third, the declaration states that release of a draft Commission statement would "cause confusion to the public because these discussions and the draft statement contain deliberations about what the final statement should be and are not reflective of the publicly released statement." J.A. 45 at ¶ 15. The final Commission statement has been public for over three years. Any "confusion" from releasing a draft

alongside a clearly identified final version is purely hypothetical. The public is capable of understanding that a draft differs from a final version.

This Court has already addressed this pattern of inadequacy. In *Reporters Committee for Freedom of the Press v. FBI*, 3 F.4th 350, 369-71 (D.C. Cir. 2021), this Court found "wholly generalized and conclusory" an agency's assertion that disclosure would "impede the fulsome discussion of issues necessary to reach a well-reasoned decision." *Id.* at 370. The SEC's language tracks the rejected language almost word for word. Compare J.A. 45 at ¶ 15 ("staff across the SEC would likely limit their discussions and inhibit their candor") with *Reporters Committee*, 3 F.4th at 370 ("agency personnel would be less candid and more circumspect in expressing their thoughts"). If the latter was insufficiently specific, the former cannot fare any better.

The SEC attempts to distinguish *Reporters Committee* as involving "purely factual material" and declarations that "did not specify harm relating to each different kind of record." Resp. Br. 49 n.11. But those are precisely the problems here. The withheld records include purely factual forensic data compiled by BRG (J.A. 51, 53-55, 57-61, 63, 65-66), email

discussions among SEC staff about the internal review (J.A. 43 at ¶ 7), and a draft Commission statement (J.A. 62). The SEC's foreseeable harm analysis does not differentiate among these categories. All three receive the same generalized assertions of chilling effects and public confusion.

The SEC has not explained why releasing raw access-log data compiled by BRG would "chill ongoing discussions" at the SEC, since access-log data is not a "discussion" at all. It has not explained why releasing email discussions from 2022-2023 about a completed internal review would chill "ongoing" discussions, since the review concluded over three years ago. And it has not explained why releasing a draft Commission statement would cause "public confusion" when the final version has been public since 2023. Congress "required more than the same tired arguments that would have supported an Exemption 5 claim in the first instance." Opening Br. 30. If the same foreseeable harm rationale applies to every document an agency could withhold under Exemption 5, the 2016 FOIA Improvement Act, 5 U.S.C. § 552(a)(8)(A)(i)(I), has accomplished nothing.

As to Exemption 6, the Supplemental Tallarico Declaration states that "SEC staff have considered the public's interest in disclosure against

the privacy interests at stake" and "disclosed all portions of documents that it reasonably foresees could be disclosed without causing harm to the SEC's interests at stake." J.A. 191 at ¶ 8. This is not a foreseeable harm analysis; it is a self-serving, conclusory assertion that a foreseeable harm analysis was conducted. There is a difference between telling a court *that* you balanced the interests and showing the court *how* you balanced them. The SEC may have done the former but certainly has not done the latter.

## V. THE SEC FAILED TO CONDUCT A REASONABLE SEARCH FOR THE SECOND CATEGORY OF RECORDS.

The SEC's defense of its response to the Second Category of records is, at bottom, a confession masquerading as an argument. The SEC concedes that it has not determined whether any closed or settled administrative proceedings were affected by the control deficiency. Resp. Br. 50-52. It concedes that NCLA asked for precisely that information. *Id*. And it argues that it need not provide the information because doing so would require "further analysis." *Id*. at 52-53.

The SEC trumpets the complexity of the internal review, noting that the review team "analyzed over 25 million rows of data from access logs" and "reviewed hundreds of case files." Resp. Br. 53. But this cuts

against the SEC. Its own description confirms it has assembled the data revealing which proceedings were affected. Having analyzed 25 million rows and reviewed hundreds of case files, the SEC cannot credibly claim that identifying affected closed proceedings would require "creating" a new record. It requires querying existing data and producing existing documents. *Center for Investigative Reporting v. U.S. Department of Justice*, 14 F.4th 916, 938 (9th Cir. 2021) ("sorting, extracting, and compiling pre-existing information from a database does not amount to the creation of a new record").

The SEC's declaration states only that "OGC staff consulted with the SEC staff handling the internal review," who stated they were unaware of any records responsive to the Second Category that have not already been produced. J.A. 191. This is not a search; it is asking the fox whether it has inventoried all the chickens. The SEC never searched any database, file system, or email archive for records concerning closed or settled proceedings affected by the control deficiency. It simply asked the same staff conducting the internal review whether they knew of any such records.

The SEC's artificial limitation of its review to pending cases, while ignoring closed and settled cases, is exactly the kind of unreasonable constraint this Circuit has rejected. An agency may not define the scope of its search to exclude categories of obviously responsive records. *McGehee v. CIA*, 697 F.2d 1095, 1101 (D.C. Cir. 1983); *Public Citizen v. Dep't of State*, 276 F.3d 634, 643-44 (D.C. Cir. 2002). The control deficiency affected the SEC's entire electronic case-management system; it was not limited to pending cases. The SEC has offered no justification for refusing to determine which closed or settled proceedings were similarly compromised.

Indeed, by limiting the search to open proceedings which the agency then claims are exempt and then dismissing *all* 42 open proceedings so that no judicial discovery can take place in those matters, SEC has deliberately insulated every aspect of its self-defined search from public scrutiny. Worse, the persons in open proceedings were not (yet) harmed by a corrupted prosecution; indeed, they ultimately benefitted from the agency's self-interested dismissals. By contrast, SEC respondents in closed or settled cases from 2017 to 2022 by definition *were* the persons most harmed by the misconduct of agency enforcement staff accessing

ALJ files that compromised either the ALJ decision or the facts about file-sharing that should also have been disclosed to anyone settling a case infected by that misconduct—before the case was settled.

Finally, the SEC's concession that it will provide the first pages of the OIPs "in a different format" if NCLA requests, Resp. Br. 54, is a tacit (if tardy) admission that its press-release-based response was inadequate. A press release is not a FOIA response. If the SEC had the ability to produce the requested documents, it should have done so years ago.

## VI. ARGUMENTS THE SEC FAILED TO ADDRESS OR EFFECTIVELY CONCEDED.

Several arguments from NCLA's Opening Brief went entirely unaddressed or insufficiently addressed in the SEC's Response, and should be treated as conceded or, at minimum, unrebutted.

First, NCLA argued that the district court failed to conduct any analysis of whether the multipurpose nature of the withheld documents undercut the SEC's privilege claims. Opening Br. 21-22. The SEC's Response does not dispute that the district court failed to conduct this analysis. As demonstrated in Part II.B, *supra*, the record establishes the dual-purpose nature of the documents. The SEC's silence on the district

court's failure to address this issue is a concession that no such analysis was conducted.

Second, NCLA argued that the district court adopted an incorrect figure for the number of withheld documents (1,855), a number that appears in none of the SEC's own submissions. Opening Br. 15. The SEC's Response acknowledges the discrepancy only to note that NCLA "cites the district court's opinion, not an SEC submission." Resp. Br. 16 n.2. That is precisely the point: the district court was working from incorrect facts, and the SEC does not explain how or why reliance on admittedly incorrect facts warrants anything other than reversal.

Third, NCLA argued that the SEC failed entirely to explain why it did not submit a new or supplemental Vaughn Index when it discovered 587 additional pages of withheld records. Opening Br. 7-8. The SEC's only response is that the existing Vaughn Index entries for parent emails already "include" their attachments. For the reasons explained in Part I.A, *supra*, this is inadequate. A Vaughn Index that does not even identify how many pages are being withheld under each entry cannot satisfy the agency's burden.

Fourth, NCLA argued that the SEC's convenient limitation of its search to pending cases, while ignoring the vast majority of cases in which the control deficiency occurred, was a transparent attempt to insulate the agency from accountability. Opening Br. 36-37. The SEC's only response is that conducting a search of closed cases would require "further analysis." Resp. Br. 52-53. That is not a legal defense; it is an admission that the SEC chose not to search the very cases in which the misconduct had the greatest effect and which held the greatest potential to expose the SEC to public scrutiny. FOIA does not permit agencies to avoid their obligations by declining to look for records they know exist, especially when the exclusion goes to the core of the misconduct.

## CONCLUSION

The SEC's Response Brief cannot cure the fundamental deficiencies in the agency's showing below. The SEC filed self-contradictory declarations, submitted a Vaughn Index that facially addresses only a fraction of the withheld records, asserted foreseeable harm in terms indistinguishable from the exemptions themselves, and conducted no meaningful search for the second category of records NCLA requested. The SEC now asks this Court to look past these concerted failures and

simply trust the agency's good faith. But trust is not a substitute for proof, and the SEC had the burden of proof on every issue in this case.

This Court should reverse the judgment of the district court and remand with instructions to require the SEC to disclose all documents responsive to NCLA's FOIA request, or, at minimum, to submit a proper Vaughn Index addressing all withheld records, conduct a genuine foreseeable harm analysis tied to the specific records at issue, and perform a reasonable search for all responsive records—including those relating to closed and settled cases.

Respectfully submitted,

/s/ Matthew D. Hardin
Matthew Hardin
Hardin Law Office
101 Rainbow Drive #11506
Livingston, Texas 77399
Phone: (202) 802-1948
Email: matthewdhardin@gmail.com

/s/ Nathaniel Lindzen
Nathaniel Lindzen
The Law Office of Nathaniel M. Lindzen
57 School Street
Wayland, Massachusetts 01778
Phone: (212) 810-7627
Email: nlindzen@corpfraudlaw.com

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[X] this brief contains 6,498 words.

2. This brief complies with the typeface and type style requirements because:

[X] this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14pt Century Schoolbook.

Dated: May 28, 2026

/s/ Matthew D. Hardin
Matthew D. Hardin

Counsel for Plaintiff-Appellant

**CERTIFICATE OF SERVICE**

I, Matthew D. Hardin, hereby certify that, on May 28, 2026, I caused to be served by CM/ECF the Reply Brief for Plaintiff-Appellant in *New Civil Liberties Alliance v. SEC*, No. 25-5383, on all CM/ECF participants.

/s/ Matthew D. Hardin
Matthew D. Hardin